UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                           PLAINTIFF

vs.                                        CRIMINAL ACTION NO. 3:15CR-83-DJH

PATRICK NEWMAN                                                     DEFENDANT

– *ELECTRONICALLY FILED* –
**SENTENCING MEMORANDUM**

Comes the United States of America, through counsel, Assistant United States Attorney Jo E.

Lawless, and files its memorandum in support of sentencing in this action currently scheduled for

January 6, 2016.

I. Factual Background

**A.   Conduct giving rise to Criminal Complaint**

On January 23, 2015, the National Center for Missing and Exploited Children (NCMEC)

received a CyberTip report from Twitter, Inc., regarding the upload of child pornography videos to

VINE.   VINE, which is owned by Twitter, is a video sharing website, in which users can upload short

form videos (approximately 5 to 6 seconds) and share with other users. Twitter reported the upload of 12

videos and 1 image to a specific VINE account.

All of the videos were uploaded from the same IP address between December 28, 2014 and

December 30, 2014 (UTC Time) and were made publicly available.   NCMEC geo-located the

registration IP address to Texas, and a CyberTip was forwarded to the Dallas Internet Crimes Against

Children Task Force.   The case was assigned to a Dallas Police Department detective. In January 2015,

the detective sent legal process to Verizon regarding IP address.   Verizon responded with subscriber

information.   The case was forwarded to the local police department with jurisdiction over the account

address.

Further investigation revealed John Doe 1's address and that he attended a local middle school.

On March 17, 2015, the detective went to the school to speak with John Doe 1 regarding the online activity reported in the Cybertip.   John Doe 1 (then a 14-year-old male), admitted to the detective that he had uploaded the videos to VINE and stated his VINE username was "young".   John Doe 1 stated he also added "13 years old and Bi" under the comments section of his VINE profile.   John Doe 1 stated he initially set the videos to private, but someone (name unknown) informed him to make the videos public. John Doe 1 stated he understood by making them public, anyone could access and view the videos.

John Doe 1 stated he had exchanged nude/sexually explicit photographs of himself with an adult male (based on the pictures John Doe received from the male) while using KIK[1] messenger.   John Doe 1 did not recall the adult's KIK screen name, but stated he believed the adult was from Oklahoma.   He stated he had been talking to, and exchanging sexual photographs with, the adult male as recently as March of 2015.   John Doe 1 stated the adult male had recently requested him to do something sexual to himself with a plunger and show the adult male.   John Doe 1 stated he gave the adult male his true age. John Doe 1 provided his user name for KIK as well as his password.

John Doe 1 stated all the online activity described above took place on his iPhone 5C.   John Doe 1 signed a consent to search form and turned over the phone to the detective.   John Doe 1's father also gave verbal consent to search the phone.   A preliminary search of John Doe 1's phone revealed that the conversations took place on KIK with an individual whose username was "321havingfun123" and vanity name of "GOOD TIMES".   The conversations took place on several dates between February 24, 2015, and March 9, 2015.   The conversations were sexual in nature. On March 18, 2015, the phone was turned over the Homeland Security Investigations (HSI) Cyber Crime Exploitation Group for full forensic processing.

On March 23, 2015, John Doe 1 underwent a forensic interview at a local Children's Advocacy

---

[1] KIK messenger is an instant messaging application for mobile devices.   It is an "app" available free of charge. Users can communicate in text messaging, and include videos as well as pictures.

Center in Texas.   During the interview, John Doe 1 stated he had created three separate VINE accounts with similar usernames.   John Doe 1 stated he had posted sexually explicit photographs to one of his accounts, which was set to public view, and he was contacted by an adult male.   These conversations began in either January or February of 2015, according to John Doe 1, and occurred initially through VINE and then KIK.   During the interview, John Doe 1 stated that he told the adult male that he (John Doe 1) was either 13 or 14 years old and that on at least one occasion John Doe 1 showed his face in the video/photo he shared with the adult male. John Doe 1 described several sexually explicit conversations with the adult male in which sexually explicit photographs and videos were traded between them. John Doe 1 stated he thought the adult male's KIK username was "funtimes".   He recalled that "funtimes" had a profile picture of an adult male's chest area which he described as "hairy".   John Doe 1 stated "funtimes" also sent him a facial picture.   John Doe 1 described the man as Caucasian, bald, with a dark beard.     According to John Doe 1, the adult male told him he lived in Oklahoma.   John Doe 1 stated the adult male would instruct him to engage in various sexual acts and send videos/photos of the acts to the adult male.   John Doe 1 described one request from the adult male that John Doe 1 use a plunger on himself.   John Doe 1 described images he received from the adult male, including the background shown in the images.   John Doe 1 specifically referenced the adult male's house, including what appeared to be the bathroom of the house (including the tile color) when the adult male was taking the photos of himself.

Several KIK chats between John Doe 1 and the adult male were discovered on John Doe 1's IPhone5C.[2]   The chats were sexually explicit in nature and contained thumbnail photograph stills of either videos or photographs that John Doe 1 and the adult male had exchanged with each other.   One conversation, on March 9, 2015, included the following excerpts user "321havingfun123" sent to John

---

[2] A redacted copy of the chat accompanies this memorandum at Exhibit 1.   The redaction removed all victim identifiers as well as any images depicting body parts.

Doe 1 via KIK:

> "Make me a long sexy video. Think you could do it on the app not on here?"
> "I just want to see as much of you as possible"
> "I need that right pink hole bouncing on my hard cock"
> "Can you use that plunger? Maybe set up the camera on the counter and use it?"

A few minutes later, a thumbnail photograph depicting a yellow rod inserted into an anus is sent by John Doe 1 to "321havingfun123."   In response, "321havingfun123" wrote - "I need to see you cum."

Law enforcement officials in Texas sent legal process to KIK for username "321havingfun123", first/last name: "Good Times".   Law enforcement traced the information to the Louisville, Kentucky, area and, specifically, Patrick Newman, at an address on Stanton Blvd.

Law enforcement officials conducted surveillance and conducted further investigation concerning the Stanton Blvd. address and Patrick Newman.   They identified Patrick Newman as a 32-year-old male.   He worked as a teacher and assistant football coach at Trinity High School in Louisville, Kentucky.   According to the school's publicly available website, Newman previously worked as a teacher at two Louisville Catholic elementary schools.   The photograph displayed on the school's website showed Newman as a bald, white male, with a dark beard – matching the description previously provided by John Doe 1.

On June 1, 2015, a Special Agent with HSI requested and obtained a federal search warrant for Newman's residence for the purpose of seizing and further analyzing cellular telephones, computers, and other digital devices.   On June 2, 2015, law enforcement officials executed the above-referenced search warrant.   Upon arrival at the residence, law enforcement officials knocked and announced their presence.   Newman's mother answered the door.   Law enforcement officials located Newman in the back bedroom where he was sleeping.

Law enforcement officials advised Newman of the search warrant and that it pertained to online activity dealing with child exploitation in which IP address logs were reported to his address.   When he

4

was asked if he would answer questions regarding the activity, Newman stated he wasn't sure if he wanted to talk.   Newman also stated he might want to talk with somebody, but did not mention who he wanted to speak with.    Newman was informed that he was not under arrest at that time and did not have to answer any questions.   Newman was informed that agents and officers would continue to search and process the residence.   They asked Newman to remain where he was until the other rooms had been searched.   When asked if he wanted updates as the search continued, Newman stated he would like updates.

A Computer Forensic Agent conducted onsite previews of a laptop computer, tablet, HP Desktop CPU Tower, and a flash drive.   No images of child pornography were found on any of those devices. Newman provided agents with the passcode to his cellphone.   A preliminary search of internet history on the iPhone revealed a link to a Dropbox account.   Additionally, the law enforcement official noticed a thumbnail image of some type of pornography.

A law enforcement official advised Newman what he had discovered on the iPhone and explained to Newman that they knew about his online chats with "John Doe 1" from Texas.   The law enforcement official informed Newman that he was concerned about the safety of the child in Texas and safety of other children Newman may have contacted.   Newman stated he understood and stated he would answer questions on a question by question basis.   Newman agreed to have the interview audio recorded and also signed a statement of rights waiver.

During the interview, Newman admitted to using KIK and VINE to communicate with John Doe 1 while using the screen name "321havingfun123".   He stated he knew John Doe 1 was a minor and that the two had traded sexually explicit photographs with one another.   Newman stated he recalled John Doe 1 as wearing glasses.   Newman was shown a photograph of John Doe 1.   He stated he thought it was the same person he chatted with on KIK.   Newman also recognized the KIK screen name used by

5

"John Doe 1."   Newman was shown portions of the KIK chat logs that were located on John Doe 1's cell phone.   He recognized the chat logs and recalled details of the chat, including encouraging John Doe 1 to use a plunger for sexual purposes in order to send Newman images of the activity.

Newman gave verbal consent for the law enforcement official to search through his KIK account friends list.   Newman stated that he had spoken with other minor boys through KIK and had traded videos and photographs with the minors.   Newman also stated some of his KIK friends are adults who have traded child pornography with him.   Newman also gave verbal consent to search his Dropbox account.   He stated he had used two separate Dropbox accounts and provided his usernames and passwords.   Videos of child pornography were located in both Dropbox accounts.

Newman admitted a sexual attraction mainly to minor boys, ages 13 to 17.   But, he denied ever sexually abusing any children in person.

**B.   Additional conduct giving rise to Indictment**

1.   Production of child pornography

Law enforcement officials continued the investigation of Newman's online activities.   Law enforcement officials reviewed the contents of Newman's cellular telephone as well as his online social media accounts – as contained on the phone without connection to the Internet.   In other words, they reviewed communications that were stored on the phone itself.   Through the course of that review, law enforcement officials discovered numerous communications between Newman and individuals who self-identified as being under the age of 18.   Law enforcement officials identified 16 victims under the age of 18.   The youngest – age 12.   The review also revealed Newman's communication with other individuals for whom age could not be readily identified.

The communications included discussions concerning sexual activity between Newman and the individuals and/or Newman's sexual activity with others (including minors).   A summary of the

6

communications that resulted in Newman soliciting the production of child pornography (self-produced by each minor) is as follows:

**COUNTS 1 & 2**

John Doe 1 – Texas victim – began age 13 and continued until age 14.   The specifics of their communications are set out above and will not be repeated.

**COUNT 3**[3]

John Doe 2 –Utah victim – age 17.   On March 24, 2015, almost immediately, Newman asks for pictures of John Doe 2, including trading face pictures. The two communicated with each other through June 1, 2015.   During the course of their communications, the two exchanged sexually explicit images of each other masturbating.   Additionally, on April 2, 2015, Newman sent John Doe 2 a message – "I'm meeting a boy tonight and gonna film it."   Three days later, John Doe 2 asked about the meeting, to which Newman responded, "Fucking awesome.   I'll show you later on."   Late that day, Newman sent the following message, "Sweet.   I'll tell you all about it and share what I've got."   The next day, John Doe 2 asked what had happened on Thursday.   Newman responded, "Oh, yea.   I went to the guy's house and snuck in.   I've done it twice before."   Newman went on to give specific details of his sexual activity with the boy he identified as being 17.   When asked if the boy was cool with Newman recording their sex acts, Newman responded, "Yup."   He also told John Doe 2 that he (Newman) had shown the recording to a few people on the social network, but said he only shared with people he really trusted. The two then negotiated what John Doe 2 needed to do in order to receive the video from Newman. Newman stated, "Let's trade some first.   I've barely seen any of you."   The two then exchanged images of their faces with one another.

---

[3] A redacted copy of the communications accompanies this memorandum as Exhibit 2.   The redaction removed all victim identifiers as well as any images depicting body parts.

**COUNT 4**[4]

John Doe 3 – Texas victim – age 16.   On March 30, 2015, Newman contacts John Doe 3, noting he had seen postings on VINE.   The two exchanged information concerning their respective ages and where they lived.   The two communicated through May 31, 2015.   During the course of the communications, the two traded videos.   Newman would make a video and send it to John Doe 3.   In exchange, John Doe 3 would make a video of similar activity and send it to Newman.   On April 2, 2015, Newman sent a message to John Doe 3 stating that he was "meeting a boy tonight and gonna film it."

**COUNT 5**[5]

John Doe 4 – Kentucky victim - age 15.   On March 5, 2015, Newman began communicating with John Doe 4 through the social media application Grindr.   The conversation began with the two discussing the fact that they had communicated in the past.   They exchanged pictures of their faces. The two discussed having met in person and made plans to do so again.   Newman asked John Doe 4 if he would be willing to allow another male to join them.   Newman asked John Doe 4 to send him pictures to show the third male and John Doe 4 sent still images of his naked penis.

John Doe 4 asked for a picture of the third male's face.   Newman sent a photo of a young male (unspecified age).   He claimed that he and the third male had met up before and that the male is better in person (than in the photo).   John Doe 4 told Newman he was not interested in adding a third person. The two made arrangements for Newman to come to the house to meet John Doe 4 on April 2 and that Newman would video their activities together.   The two discussed the sexual activity they would engage in.   Newman gave John Doe 4 updates as he drove from Louisville to meet John Doe 4.

---

[4] A redacted copy of the communications accompanies this memorandum as Exhibit 3.   The redaction removed all victim identifiers as well as any images depicting body parts.

[5] A redacted copy of the communications accompanies this memorandum as Exhibit 4.   The redaction removed all victim identifiers as well as any images depicting body parts.

A few days later, Newman asked when John Doe 4 would be at that house (a relative's) again. John Doe 4 asked Newman to send him the videos of the two of them together and Newman complied. The two engaged in oral and anal sex during the videos.

On May 8, 2015, the two made arrangements to meet again for sexual activity.   Newman videoed the encounter.   During later communications, Newman asked John Doe 4 about the boy having had an encounter with one of his teachers.   Newman told John Doe 4 that he wanted to know about it because he (Newman) was a teacher.   John Doe 4 asked where Newman was a teacher, but Newman did not tell him.   Newman asked John Doe 4, "Is it a turn on that I'm a teacher too"?   When John Doe 4 replied that he wished Newman was his teacher, Newman responded "That would be kinda awkward-d wouldn't it . . . I mean sitting in class together . . . You'd have to try and be not so obvious that I eat your ass so well [winking, smiling emoticons] . . . I mean you'd have to be able to control yourself around me haha."   On May 31, 2015, Newman told John Doe 4 he would be attending a graduation party for one of his students.   John Doe 4 also stated he would be attending a graduation party that day – but the two determined they would not be at the same party.

**COUNT 6**[6]

John Doe 5 – Indiana victim – age 17.   On April 5, 2015, John Doe 5 and Newman began communicating through a social media application.   The two exchanged their ages, gender, and location – including cities and states.   John Doe 5 lived near Indianapolis, Indiana.   Upon learning this information, Newman wrote, "If you were closer we could just meet up," followed by "Want to swap some pics"?   John Doe 5 declined and noted he'd rather Skype[7] Newman, however, suggested swapping just one or two for now, adding that maybe they could Skype later.   John Doe 5 complied and

---

[6] A redacted copy of the communications accompanies this memorandum as Exhibit 5.   The redaction removed all victim identifiers as well as any images depicting body parts.

[7] Skype is an application that allows users to communicate in real time by text, video, and voice.

sent a photo of his naked penis and Newman responded in kind.   Newman then asked for a body pic from John Doe 5 and John Doe 5 sent one.

A couple of days later, the two communicated again.   During the conversation, Newman asked about John Doe 5's sexual preference.   John Doe 5 responded and asked the same of Newman. Newman responded, then began asking John Doe 5 to tell him about his sexual experiences, offering to share some of his {Newman's} in return.   Newman suggested that he would visit the boy in person. When John Doe 5 responded, "okay! lol," Newman noted "I'm serious."   Newman proceeded to tell John Doe 5 about meeting a guy on Grindr who he thought was 17, sneaking into the house one night, and the various sexual activities the two had engaged in.   Newman told John Doe 5 that he had met the guy on three occasions for sex and that the guy lived about 20 minutes from him.   Newman wrote, "Maybe it can be you one day."

During a different conversation, Newman asked John Doe 5 if he had the Kik video application and explained to him how to get it.   The two use Kik.   Later, Newman referenced John Doe 5 having sent him a video of himself masturbating.   Newman also told John Doe 5 about meeting the 17-year-old from Grindr for a fourth time.   He provided details of the sexual encounter and asked John Doe 5, "Wish it was you?"   While discussing the sexual encounter with the other boy, Newman asked John Doe 5, "Did that get you hard?" followed by "Let me see (winking, smiling emoticon)."   John Doe 5 sent Newman a photograph of his left hand on his erect penis.   Newman responded in kind.   Newman asked whether John Doe 5 thinks he can handle it.   John Doe 5 responded, "hell yea!" and Newman replied, "Let me see."   John Doe 5 sent a photo of his anus to Newman.   The conversation continues in a sexual manner.

When John Doe 5 asked for a picture of Newman's face, Newman sent one.   John Doe 5 sent Newman photos of his face and upper body.   While discussing when John Doe 5 would be finished with

the school year, Newman suggested, "Perhaps we could do something during the summer (winking, smiling emoticon)."   John Doe 5 responded, "probs not," explaining that he didn't know him. Newman noted that they should get to know one another.   Newman offered to send John Doe 5 "vids" of him with other guys.   Newman sent John Doe 5 two videos involving sexual activity.   He described the other person in the video as having said he was 18, but that Newman thought he was 17.   Newman asked John Doe 5 about other sexual encounters John Doe 5 had had.   He then asked about how the encounters happened.   Newman told John Doe 5 that there had been lots of guys he would have loved to have messed around with, but he never knew how to approach it.   "I never wanted anyone to know unless they were into it too."

**COUNT 7**[8]

John Doe 6 – New York victim – age 15.   Newman and John Doe 6 began communicating on April 20, 2015.   They exchanged information concerning age, gender, and location, commented on each other's profile pictures, and then began trading photos.   Newman sent a photo showing himself pulling down his underwear to expose his penis.   John Doe 6 sent a photo of himself wearing underwear. Shortly thereafter, Newman asked for more photos from John Doe 6, who complied.   The two traded nude photos and discussed engaging in sexual conduct with each other.   Newman suggested trading videos and asked John Doe 6 whether he had ever been with a guy.   Newman told John Doe 6 he'd like to give him something to compare his prior experience with, then asked for more photos.   John Doe 6 responded with a photo of his full frontal nudity.   Newman asked what the two would do if they met in person and a sexual conversation ensued.

During the next conversation on April 22, 2015, told John Doe 6 about going to the gym to work

---

[8] A redacted copy of the communications accompanies this memorandum as Exhibit 6.   The redaction removed all victim identifiers as well as any images depicting body parts.

out.   He asked the boy if he did anything other than school.   John Doe 6 indicated that he ran track.

Newman discussed the events John Doe 6 participated in, complimenting John Doe 6's performance.

When John Doe 6 asked what Newman had done that day, Newman told him he had worked.   In

response to a question about what he did for work, the following conversation took place:

Newman: I think you're gonna love it.
John Doe 6: Whereee ?
Newman: I'm a high school teacher
John Doe 6: omgggggg yesssss
          Love itt !!!!
Newman: Lol
          I thought you might. I don't like telling most people on here
John Doe 6:   Why not ?
Newman:   Idk, just want to make sure I keep things on the dl
          Make sure I can trust people I guess
John Doe 6: Well I won't tell anyone lol!
Newman:   [winking, smiling emoticon]
John Doe 6:   What do you teach?
Newman:   Social Studies
John Doe 6:   Kwlll [tongue sticking out emoticon]
Newman:   Would you be able to handle it I you had me in class?
John Doe 6:   omg no
          I would die
          The temptation would kill mw
Newman:   Me too [scared emoticon]
          You'd probably get me fired lol
John Doe 6:   We'd be carefulllll
Newman:   I'd have to keep you after class for special tutoring
John Doe 6:   Omg that's my dream
          Youre 100% the best package youre hot and youre a teacher
Newman:   Lol.   You're hot and think I'm hot so I'm good with the situation too lol

Later in the conversation, John Doe 6 asked Newman if he had ever gotten any student action.   Newman

responded, "No. I'd never risk it either.   Not with kids at my school."   However, when John Doe 6

asked about what kind of action Newman had engaged in and whether any were his age, Newman

responded, "Youngest I've been with is 16," and referred to another boy, age 17.   He told John Doe 6

that he had "snuck into the 17 yo house to fuck him at night," which led to further discussion between

Newman and John Doe 6 about what they would do together.   The two exchanged more photos.

**COUNT 8**[9]

John Doe 7 – North Carolina victim – age 15.   Newman and John Doe 7 began communicating on April 30, 2015.   They exchanged information concerning their respective ages and locations.   On May 19, 2015, they exchanged photos of their faces, at Newman's request.   Newman asked John Doe 7 what he was wearing and to show him a picture.   John Doe 7 sent a picture of himself wearing only underwear.   The two discussed their sexual preferences beginning on May 19 and continuing on May 21.   The two exchanged photos of themselves masturbating.

**COUNT 9**[10]

John Doe 8 – Kentucky victim – age 15.   The online communications between John Doe 8 and Newman started on May 4, 2015.   The two exchanged information concerning their respective ages and where they lived.   John Doe 8 asked for pictures and Newman responded "You first [winking, smiling emoticon]."   When John Doe 8 asked what he wanted, Newman told him to send whatever John Doe 8 wanted to get from him.   John Doe 8 sent pictures showing part of his face, his buttocks in underwear, a side view of himself wearing underwear and tennis shoes, his anus and penis.   Newman responded with similar photos.   Later in the conversation, Newman asked whether John Doe 8 had ever been with an older guy and requested details of the encounters.   He told John Doe 8 that he (Newman) should be the next one.

---

[9] A redacted copy of the communications accompanies this memorandum as Exhibit 7.   The redaction removed all victim identifiers as well as any images depicting body parts.

[10] A redacted copy of the communications accompanies this memorandum as Exhibit 8.   The redaction removed all victim identifiers as well as any images depicting body parts.

## COUNT 10[11]

John Doe 9 – unspecified location -- age 16.   The communication started May 9, 2015.   The screen captures do not display the entirety of the text messages for several pages.   They do, however, reveal sexually explicit images sent by Newman of himself to John Doe 9.   The next day, Newman again sent several sexually explicit pictures, after texting "I'm gonna send a bunch of pics before I delete them."   The two continued online communications the next day.   John Doe 9 told Newman he was doing homework.   The two later discussed the possibility of group texting and other methods of online communication, including VINE.   The two communicated with each other using multiple apps. Newman made reference to a roommate, then disclosed that the roommate was his mom – at least for a temporary period while her house is finished.   He asked John Doe 9 to make a video while he showered.

Communications continued and on May 13, 2015, Newman and John Doe 9 traded sexually explicit photos with each other while discussing sexual activity.   Later in the conversation, Newman asked John Doe 9 to make a strip video for him. John Doe 9 replied that he didn't know what to do. Newman referenced videos he had sent John Doe 9 before, asked he wanted him (Newman) to send another one, and suggested that John Doe 9 "Just copy it."   John Doe 9 agreed and Newman sent a video for John Doe 9 to emulate.   During the same communication, Newman told John Doe 9, "So Ive decided just to be flirty with one of my students."   When John Doe 9 asked what Newman had said, Newman responded, "Oh nothing sexual for sure, just being really friendly and joking I guess . . . Like I gave him a bunch of grief about his voice cracking some today."   John Doe 9 did not respond.   A few days, however, the communications continued with Newman asking for and receiving more sexually explicit images from John Doe 9.

---

[11] A redacted copy of the communications accompanies this memorandum as Exhibit 9.   The redaction removed all victim identifiers as well as any images depicting body parts.

During a later conversation, Newman asked about John Doe 9's experiences with others.   He asked if John Doe 9 had ever experimented with his stepbrother (same age as John Doe 9).   When John Doe 9 responded no, Newman gave him advice on how to initiate contact with the boy, suggesting that John Doe 9 should "let him catch you jerking off or something."   He also asked John Doe 9 to let him see what the stepbrother looked like.   When John Doe 9 told Newman he didn't have any pictures of the boy right then, the two exchanged sexually explicit photos with each other (of each other).   Newman also sent John Doe 9 the picture of the face of a person he (Newman) intended to hook up with .   Later, Newman, John Doe 9 and another individual engaged in a group chat, during which sexually explicit images were exchanged.

### COUNT 11[12]

John Doe 10 – United Kingdom victim -- age 17.   Communications started between the two on May 17, 2015.   Newman asked John Doe 10 to send him pictures.   John Doe 10 sent images of his buttocks and anus.   Newman sent John Doe 10 a photo of himself showing full frontal nudity.   John Doe 10 also asked Newman to send him the teen videos and Newman complied.

### COUNT 12[13]

John Doe 11 –Colorado victim – age 15.   On May 19, 2015, Newman and John Doe 11 began online communication.   They exchanged age, gender and location information.   John Doe 11 asked Newman if he could come to Colorado.   Newman stated that he actually might that summer as he was going to take a drive out west.   When Newman asked whether John Doe 11 liked older guys, John Doe 11 responded that he didn't know what he liked.   Newman asked John Doe 11 to show him what he had,

---

[12] A redacted copy of the communications accompanies this memorandum as Exhibit 10.   The redaction removed all victim identifiers as well as any images depicting body parts.

[13] A redacted copy of the communications accompanies this memorandum as Exhibit 11.   The redaction removed all victim identifiers as well as any images depicting body parts.

but John Doe 11 replied, "After you."   Newman sent an image of himself – full frontal nudity.   The two talked about who was bigger, resulting in John Doe 11 sending Newman a picture of his naked, erect penis.   The two exchanged more sexually explicit images of each other.

### COUNT 13[14]

John Doe 12 – Ohio victim -- age 17.   Newman and John Doe 12 started their online communication on May 21, 2015.   They exchanged age, gender and location information.   John Doe 12 asked Newman what he was looking to do.   Newman responded, "Hoping to find guys close to meet . . . But chats trades, pics, and vids, are good."   The two agreed to trade pictures, with Newman asking John Doe 12 to send and stating he would match.   John Doe 12 sent two photos of himself including full frontal nudity and a close up of his penis.   Newman responded with nearly identical photos of himself. The two discussed grooming topics and Newman asked where in Ohio John Doe 12 lived, noting that he was going to be in "Cincy" that weekend.   John Doe 12 stated he lived in Sandusky and Newman noted that that was too far.   The two talked about sexual activity, including Newman sending a photo of a male in Newman's bathroom he purportedly had had sex with the night before.   They exchanged more images, including video from Newman.

### COUNT 14[15]

John Doe 13 –Ohio victim – age 16.   The communications started on May 26, 2015.   The two shared their respective ages and where they lived.   Newman asked if John Doe 13 was near Louisville, to which John Doe 13 replied, "No."   The two engaged in conversation related to sexual activity and exchanged sexually explicit pictures of them.   The two discussed their sexual interests – bisexuality.

---

[14] A redacted copy of the communications accompanies this memorandum as Exhibit 12.   The redaction removed all victim identifiers as well as any images depicting body parts.

[15] A redacted copy of the communications accompanies this memorandum as Exhibit 13.   The redaction removed all victim identifiers as well as any images depicting body parts.

John Doe 13 asked if Newman had anymore pictures.   Newman responded in the affirmative and then sent several nude photos of himself to John Doe 13.

### COUNT 15[16]

John Doe 14 – Kentucky victim – age 16.   The online communication started on May 26, 2015. The two shared age, gender and location and learned that both lived in the Louisville, Kentucky, area. John Doe 14 asked Newman if he wanted to meet up.   Newman told him he needed to see more pictures first.   John Doe 14 responded with a photo of his face, but Newman asked for more.   He made reference to a profile picture of John Doe 14 in his underwear.   John Doe 14 sent a photo of his crotch area in underwear, his naked buttocks, and penis.   Newman sent a nude photo of himself (frontal). John Doe 14 asked if they were going to meet up that week.   Newman asked when and where.   John Doe 14 responded tomorrow in Mt. Washington.   When Newman asked if John Doe 14 would be home alone, John Doe 14 responded that he would be but was thinking they could go somewhere private.   The two discussed engaging in unprotected sexual activity, during which Newman sent a photograph of himself masturbating.

### COUNT 16[17]

John Doe 15 –Ohio victim – age 15.   Newman and John Doe 15 communicated on May 27 and 28, 2015.   The two exchanged information concerning where they lived.   Newman asked John Doe 15 if he liked older guys prompting John Doe 15 to ask Newman's age.   Neman told John Doe 15 he was 31.   The two exchange photos of their faces.   At John Doe 15's request, Newman sent an up close photo of his penis.   John Doe 15 sent Newman a photo of his naked buttocks.   Newman asked for more

---

[16] A redacted copy of the communications accompanies this memorandum as Exhibit 14.   The redaction removed all victim identifiers as well as any images depicting body parts.

[17] A redacted copy of the communications accompanies this memorandum as Exhibit 15.   The redaction removed all victim identifiers as well as any images depicting body parts.

photos, and John Doe 15 responded "U first."   Newman sent another up close photo of his penis and John Doe 15 replied with a photo showing part of his face and the top of his buttocks with his pants pulled down.   Newman asked for videos, but John Doe 15 told him he didn't do videos as they were too much work.   Newman asked John Doe 15 where he lived in Ohio, and learned it was in Cincy.   John Doe 15 told Newman he was 15 and asked if they were good.   Newman responded by asking if John Doe 15 was good with it and if it could stay a secret.   He asked if John Doe 15 had ever done anything sexually.   John Doe 15 told him no, that he was a virgin, and gay.   Newman asked if John Doe 15 wanted him to change his virgin status, to which John Doe 15 told him he didn't know yet.

**COUNT 17**[18]

John Doe 16 – Oregon victim – Age 12.   The two communicated on May 29 and May 30, 2015. They exchanged information concerning their ages and where they lived.   Newman asked for a picture of John Doe 16's face and him showing a thumbs up.   John Doe 16 did not send that photo, but rather a nude photo showing him from the waist down and legs spread apart.   The two communicated back and forth about face pictures, with John Doe 16 explaining that he was scared to send it because he had sent one before and the person passed in on to others.   Newman then asked if John Doe 16 had Snapchat.

2. <u>Distribution / possession of child pornography</u>

In addition to producing child pornography, Newman also distributed images of child pornography to other individuals.   As noted above, in some instances, he distributed child pornography to minors in an effort to encourage/entice them to send him child pornography in return.   The forensic examination of Newman's phone revealed the exchange of pictures and videos between Newman and 56 individuals (not including the minors identified as John Does).

---

[18]A redacted copy of the communications accompanies this memorandum as Exhibit 16.   The redaction removed all victim identifiers as well as any images depicting body parts.

Aside from the images and videos Newman obtained directly from the victims – and the videos he created with John Doe 4 – Newman possessed 87 videos of child pornography.   He maintained the collection in his Dropbox account.

## II.   Crimes of Conviction

Newman agreed to plead guilty to a felony Information.   The Information contained 19 Counts, including offenses of online enticement, production of child pornography (16 victims), transportation/distribution of child pornography, and possession of child pornography.   (18 U.S.C. §§ 2251(a), 2251(e), 2422(b), 2252A(a)(1), 2252A(a)(5)(B), 2252A(b)(1) and 2252A(b)(2).   He did so without benefit of a Plea Agreement.

## III.   Sentencing Guidelines calculations

Even in the post-*Booker* sentencing era, the Sixth Circuit Court of Appeals has reiterated the continued importance of the United States Sentencing Guidelines in the federal sentencing process.   *See United States v. Anderson*, 526 F.3d 319 (6th Cir. 2008).   The *Anderson* court opined that

> [a]t the outset, we note that it is unclear that an error in determining the Guidelines recommendation can ever be considered harmless post- *Gall. Gall* clearly directed the focus of sentencing courts to the Guidelines. For instance, the Court held that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.   128 S.Ct. at 596. '[T]he Guidelines should be the starting point and the initial benchmark,' so as to ensure fair sentencing 'administration and to secure nationwide consistency.' *Id.* Furthermore, the Court held, '[t]he fact that 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.' *Id.* at 596 n. 6. If the district court decides to sentence a defendant outside of the Guidelines range, then the district court 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. [The Court] f[ou]nd it uncontroversial that a major departure should be supported by a more significant justification than a minor one.'   *Id.* at 597. On appeal, the Courts of Appeals 'must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range .... or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range.' *Id.*

*Id.* at 329.   The *Anderson* court further noted that such a focus on the Guidelines "is consistent with the Court's other recent sentencing precedent" and went on to reference the decisions in *United States v. Booker*, 543 U.S. 220, 245-46, (2005), *Kimbrough v. United States*, 128 S.Ct. 558, 564 (2007), and *Rita v. United States*, 127 S.Ct. 2456, 2468 (2007), to include the opinions' respective references to the role of the Guidelines.   *Id.*   The United States has no objection to the Guideline calculations set out in the presentence investigation report (PSR).

IV.   Criminal History

The United States concurs with the criminal history calculation as set out in the PSR.

V. Statutory Factors

**A.   Minimum and maximum penalties**

The statutory mandatory minimum sentence required for Counts 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, and 17 is 15 years' imprisonment, with a maximum of 30 years' imprisonment, for each count.   Count 2 carries a statutorily mandated minimum sentence of 10 years in prison and a maximum potential sentence of life in prison.   Count 18 carries a mandatory minimum sentence of 5 years' imprisonment and a maximum potential sentence of 20 years' imprisonment.   Finally, Count 19 has no mandatory minimum sentence requirement.   The maximum potential sentence is 10 years in prison.   The maximum potential fine for each count is $250,000.00.   The term of Supervised Release for each count is not less than five years and the maximum is life.

**B.   18 U.S.C. § 3553(a) factors**

The total Sentencing Guidelines' offense level is 43.[19]   The Criminal History Category is

---

[19] In actuality, when all of the enhancements allowed for under the Sentencing Guidelines are applied in the case at bar, the offense level is 52.   With a three-level reduction for acceptance of responsibility, the offense level lowers to 49.   However, the Sentencing Guidelines provide for an offense level cap of 43.

"In rare cases, a total offense level of less than 1 or more than 43 may result from application of the guidelines. . . .   An offense level of more than 43 is to be treated as an offense level of 43."   U.S.S.G. Chapter 5 Pt. A, Application Note 2.

correctly calculated at I.   Consequently, the recommended punishment range is life in prison.

This Court must ultimately affix a sentence which is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).   For the reasons that follow, the United States respectfully requests that the Court impose a sentence of X imprisonment followed by a life term of Supervised Release.

Title 18, United States Code, section 3553(a) guides the Court regarding factors to consider when imposing a sentence.   That section directs courts to consider the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines–
. . .

(5) any pertinent policy statement--
. . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)

Newman stands convicted of very serious child exploitation offenses.   Within the range of

21

criminal acts perpetrated upon children, his conduct is at a very high level of the spectrum.   The sheer number of victims sets him apart from any other defendant previously prosecuted for child exploitation offenses in this District.   While it is true that the victims in this case were compliant and that Newman did not use physical force against them, the harm to the victims cannot be overstated.

Brain development has been the focus of medical study for many years.   Through the use of magnetic resonance imaging (MRIs) and other research tools, neuroscientists have been able to see how the brain actually functions.[20]   The research and studies have shown how and when the brain grows. Most experts suggest that the brain is not fully developed until age 25.   Notably, the prefrontal cortex, the part of the brain responsible for impulse control, decision-making, risk management, and logical thinking, among others, continues into the mid 20's.   This background is important because all of Newman's victims (charged in Counts 1-17) were under the age of 18.   They were boys going through puberty, into young adulthood.   Review of their communications reveals that all were experiencing sexual development, discovering sexual preferences and identity.   At that vulnerable point in their development, and through the prolific use of social media, Newman entered their lives.

Newman, a well-educated, intelligent, charismatic adult had extensive experience working with adolescent and teenage males.   Newman had worked as a teacher and coach for elementary, middle and high school students for approximately 10 years.   He understood the struggles faced by a young male with homosexual interests.   He used that knowledge and experience to befriend and then exploit the victims in this case.   The communications summarized above demonstrate the acuity with which he was able to use his experiences and information to entice and induce the boys to engage in extremely risky,

---

[20] *See, e.g.*, http://www.pbs.org/wgbh/pages/frontline/shows/teenbrain/work/adolescent.html, https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID=1&ContentID=3051, http://mentalhealthdaily.com/2015/02/18/at-what-age-is-the-brain-fully-developed/, and http://hrweb.mit.edu/worklife/youngadult/index.html.

detrimental conduct.

Newman maintained stable employment and strong personal ties in his daily life.   By all accounts, he was a productive member of his community.   All the while, he engaged in nearly constant communication with people he knew to be minors for the purpose of feeding a sexual desire.   While he was cooperative with law enforcement when they arrived at his home with the federal search warrant, he was not completely truthful.   He led investigators to believe that all of his conduct had been limited to online communication.   That was not true.   He met multiple boys for the purpose of engaging in sexual activity.   With at least one, he produced video recordings of their sex acts and then traded those images with others – some of whom were minors in an effort to induce them to produce sexually explicit materials and send to him.   He engaged in all of this conduct while simultaneously trading and acquiring significant quantities of child pornography videos and still images.

The sentence imposed in this action should be substantial in order to adequately reflect the seriousness of the current offenses, promote respect for the law, provide just punishment for the offense, deter further criminal conduct, protect the public from further crimes of the defendant, and avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.   A sentence of 120 years' imprisonment meets these factors.   Such a sentence will reflect the seriousness of Newman's criminal conduct.   A significant sentence of imprisonment will also promote respect for the law and give clear notice that child sex offenders will be punished harshly.   A 120-year sentence will serve as a deterrent for further criminal conduct and protect the public from further crimes by Newman.   With regard to avoiding sentencing disparities, as noted above, Newman is peerless.

In considering the kinds of sentences available, the statutory framework outlined above cannot be overlooked.   The lowest end of the applicable Guideline range is life.

23

<u>CONCLUSION</u>

Newman's conduct has caused significant emotional pain and suffering for the victims and their families identified and given notice to this point and he should be punished for that harm.   The investigation continues, with regard to personally identifying and notifying Newman's victims – as required by law.   The fullness of his harm has not yet been realized.

However, Newman pled guilty to the charges – saving the victims further trauma of trial testimony.   For that, he should be given some credit by way of a lower sentence.   The recommended sentence is ½ of the statutory mandatory minimum sentence for production of child pornography, multiplied by the number of production victims identified in this case.

For the reasons set forth herein, the United States respectfully requests the Court to apply the Sentencing Guidelines as set forth in the PSR and acknowledged above, follow the statutory directives set out in 18 U.S.C. § 3553(a), and impose a sentence of 120 years' imprisonment, followed by a life term of Supervised Release.

Respectfully submitted,

JOHN E. KUHN, JR.
United States Attorney

/s/ *Jo E. Lawless*
Jo E.   Lawless
Assistant United States Attorney
717 West Broadway
Louisville, Kentucky 40202
(502) 625-7065
Fax (502) 582-5097

<u>CERTIFICATE OF SERVICE</u>

 I hereby certify that a copy of the foregoing was sent by electronic means through the Court's ECF system on January 1, 2016, to defense counsel.


<u>/s/ *Jo E. Lawless*</u>
Jo E. Lawless
Assistant United States Attorney

25