```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )     Case No. 3:15-CR-00083-DJH
 4                                  )
             Plaintiff,             )
 5                                  )
         VS.                        )
 6                                  )
     PATRICK NEWMAN,                )
 7                                  )     January 6, 2016
             Defendant.             )     Louisville, Kentucky
 8

 9                          *   *   *   *   *

10                    TRANSCRIPT OF SENTENCING
                   BEFORE HONORABLE DAVID J. HALE
11                  UNITED STATES DISTRICT JUDGE

12                          *   *   *   *   *

13   APPEARANCES:

14   For United States:       Jo E. Lawless
                              U.S. Attorney's Office
15                            717 West Broadway
                              Louisville, KY 40202
16
     For Defendant:           Brian Butler
17                            Dathorne & Butler, LLC
                              600 West Main Street, Suite 500
18                            Louisville, KY 40202

19   [Defendant present.]

20

21                        Dena Legg, RDR, CRR, CCR-KY
                            Official Court Reporter
22                          232 U.S. Courthouse
                            Louisville, KY 40202
23                            (502) 625-3778

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25
```

1          (Begin proceedings in open court at 2:17 p.m.)

2                DEPUTY CLERK:  Judge, we're here on 3:15-CR-83, *United*

3    *States of America v. Patrick Newman*.

4                MS. LAWLESS:  Good afternoon, Your Honor.  Jo Lawless

5    on behalf of the United States.

6                MR. BUTLER:  Your Honor, good afternoon.  Brian Butler

7    on behalf of Patrick Newman.  He's standing at the podium, sir.

8                THE COURT:  All right.  Good afternoon.  As I

9    mentioned to counsel just a minute ago, I apologize for the

10   brief delay.  I hope that that delay will help us expedite the

11   proceeding to the benefit of all involved.

12      Let me start by saying I've received, let's see, sentencing

13   memoranda from both the United States and defense counsel.

14   Mr. Butler's also submitted numerous letters in support of the

15   defendant.  I've carefully considered all of the materials that

16   have been submitted to me.

17      Are there any other documents or letters that either side

18   wishes to submit at the start of the hearing?

19                MS. LAWLESS:  I have one, Your Honor.

20                THE COURT:  Is it in the nature of a victim statement?

21                MS. LAWLESS:  No, sir.  This is -- I'm sorry.  I'll

22   move back.

23                THE COURT:  That's okay.

24                MS. LAWLESS:  This is in response to one of the

25   letters that you received from the defense that we've asked the

1   court to unseal.

2         THE COURT:  All right.  Yes, can you submit that now,

3   if you'd like.

4      Is that one you just wish for me to consider or is that

5   something that needs any explanation or argument along with it?

6         MS. LAWLESS:  I will offer by way of explanation and

7   I -- it has United States Exhibit 17 on it, Your Honor, because

8   I expected to bring it to the court's attention later on.  It is

9   in response to --

10         THE COURT:  All right.  Well, why don't -- rather than

11   offer any explanation, I will consider the letter, and then to

12   the extent that you need to refer to it through the course of

13   the proceeding, that's fine.

14         MS. LAWLESS:  Thank you.

15         (Government Exhibit 17 admitted in evidence.)

16         THE COURT:  Ms. Lawless, do you expect witness

17   testimony today?

18         MS. LAWLESS:  I do, Your Honor.

19         THE COURT:  All right.  And what about victim

20   statements?  Do you anticipate --

21         MS. LAWLESS:  I do, Your Honor.  Two parents are

22   present and would like to address the court personally.  I also

23   have a written statement that I received last night from the

24   mother and father of another victim who live in New York, and

25   they asked me to read it to the court.

```
1            THE COURT:  All right.  We'll get to that in due
2    course then.  Thank you.
3       Mr. Butler, how about from you?  Do you anticipate any
4    testimony today?
5            MR. BUTLER:  Yes, Your Honor, we would anticipate
6    calling Dr. David Breeding to discuss his report that the court
7    has, and Mr. Newman at the appropriate time would also like to
8    address the court.
9            THE COURT:  All right.  Mr. Butler, have you and your
10   client, Mr. Newman, read and discussed the presentence
11   investigation report?
12           MR. BUTLER:  Yes, Your Honor.
13           THE COURT:  And are there any objections remaining to
14   be considered by the court?
15           MR. BUTLER:  No, Your Honor.
16           THE COURT:  All right.
17           MS. LAWLESS:  No objections for the United States
18   either, Your Honor.  We believe that the report -- that the
19   guidelines were accurately calculated.
20           THE COURT:  All right.  So there's no longer any need
21   for any argument on objections either to the calculations or the
22   factual findings?
23           MS. LAWLESS:  That's correct for the United States.
24           MR. BUTLER:  Correct, Your Honor.  We -- that's
25   correct.
```

1            THE COURT:  All right.  Then I'll adopt the PSR

2    without objections.

3        Before we get to the testimony, let's briefly discuss the

4    final guideline calculations.  Let me summarize them.  I realize

5    we have no objections or anticipate any further argument on the

6    calculations, but let me just summarize them for the record and

7    make sure we're all on the same page.

8        Without further objection, that would leave an adjusted

9    offense level of 42 with respect to Counts 1 and 2; with respect

10   to Counts 3, 4, 6, 10, 11, 13, 14, and 15, an adjusted offense

11   level of 34; Count 5, an adjusted offense level of 40; Count 7,

12   8, 9, 12, 16, and 17, an adjusted offense level of 36 for each

13   of those counts; and then Counts 18 and 19, adjusted offense

14   levels of 38.  I believe that's right.  Is it, Ms. Teague?

15            PROBATION OFFICER:  Yes, Your Honor.

16            MR. BUTLER:  Yes, sir.

17            THE COURT:  Is that correct?  And then when we apply

18   the Sentencing Guideline Section 3D1.4 and then Section

19   4B1.5(b)(1), that results in a total offense level of 52.  The

20   maximum offense level to be considered by the guidelines is only

21   43.  So that takes us back down from 52 to 43.  The criminal

22   history computation is zero.  That produces a guideline range of

23   life in prison.  So that is the guideline calculation that we'll

24   be considering going forward in the hearing.

25        So any further discussion regarding those calculations?

Adcock - Direct

```
 1                MS. LAWLESS:  No, sir.

 2                MR. BUTLER:  Not regarding the calculations, no, sir.

 3                THE COURT:  All right.  Let's go ahead then with the

 4     witness testimony.

 5                MR. BUTLER:  Yes, sir.

 6                MS. LAWLESS:  Thank you, Your Honor.  The United

 7     States would call Detective Joe Adcock.

 8          (DETECTIVE JOSEPH ADCOCK, called by the Government, sworn.)

 9                        DIRECT EXAMINATION

10     BY MS. LAWLESS:

11     Q.  Good afternoon, Detective.  Would you state your name for

12     the record, please, and spell your last name.

13     A.  Joe Adcock, A-D-C-O-C-K.

14     Q.  And please tell the Court by whom you're employed.

15     A.  I'm a detective in Texas and also a task force officer with

16     Homeland Security Investigations.

17     Q.  Detective Adcock, are you familiar with the investigation in

18     this case that ultimately led to the charging and arrest of

19     Mr. Newman?

20     A.  Yes.

21     Q.  And could you please tell Judge Hale just very briefly how

22     it is that you were involved in that investigation.

23     A.  The National Center for Missing and Exploited Children had

24     sent a cyber tip to Dallas PD ICAC regarding a Vine account with

25     possible child pornography on it.
```

Adcock - Direct

1        Through the preliminary investigation of Dallas ICAC, that

2   IP address was traced to the jurisdiction that I work and the

3   case was sent to me in February of 2015.

4   Q.  Were you able to identify the child that was involved in

5   those communications?

6   A.  Yes.

7   Q.  All right.  And did you in fact interview that child and

8   then forward some leads to other law enforcement?

9   A.  Yes.

10  Q.  Okay.  Part of that early investigation, Detective, did it

11  involve reviewing forensically the cell phone or other digital

12  devices that the child had?

13  A.  I reviewed the cell phone after obtaining it from the child

14  and then sent the child -- sorry -- sent the phone to Homeland

15  Security Investigations' Forensic Unit.

16  Q.  Were there communications retrieved from that phone that

17  ultimately led to the investigation here in Louisville?

18  A.  Yes.

19          MS. LAWLESS:  May I approach the witness, Your Honor?

20          THE COURT:  You may.

21  BY MS. LAWLESS:

22  Q.  Detective Adcock, I've handed you a red envelope that's

23  marked United States Exhibit 1 sealed.  Before we came to court

24  today, did you have an opportunity to review the contents of

25  that?

Adcock - Direct

1    A.  Yes.

2    Q.  Okay.  And are the contents of that accurate depictions of

3    the communications between the child in Texas and Mr. Newman?

4    A.  Yes.

5    Q.  Including names, content, and images that were exchanged?

6    A.  Yes.

7            MS. LAWLESS:  Your Honor, I would move for admission

8    of United States Exhibit 1 under seal, please.

9            MR. BUTLER:  No objection, sir.

10           THE COURT:  It will be admitted.

11           (Sealed Government Exhibit 1 admitted in evidence.)

12   BY MS. LAWLESS

13   Q.  Stepping aside from the investigative part of the case,

14   Detective, have you had ongoing interactions and communications

15   with the victim in Texas and his father?

16   A.  One other interaction with the child when he was

17   forensically interviewed at our FC center and then several phone

18   calls with his father.

19   Q.  All right.  And if you could, please, just describe for the

20   court what efforts you, in conjunction with the child advocacy

21   center and also the prosecutors involved in this case, have

22   taken to try to make services available for the child.

23   A.  There was some resistance from his father regarding getting

24   counselling so what we did is I was able to obtain a counselor

25   that would agree to provide services free of charge for the

Adcock - Direct

1    victim in Texas, who was licensed on several levels regarding

2    trauma and sexual-based incidents.

3    Q.  All right.  To your knowledge, Detective, has the family

4    taken advantage of any of those opportunities?

5    A.  As of when I spoke to the father last week, no.

6    Q.  Okay.  And what did he tell you about that?

7    A.  He said that he believes that the counselling within the

8    family, not only the immediate family, but they had extended

9    family come in from out of state, he thought that would be

10   sufficient in dealing with the issues.

11   Q.  All right.  Did he talk to you at all about any impact that

12   this case has had on what prior to this would have been his

13   child's life with regard to friends, spending time with them or

14   any activities that he's allowed or not allowed to do?

15   A.  He said he basically has put him on lockdown regarding his

16   internet activities other than school-required internet

17   activities.

18       He's not allowed to go to any friend's houses to spend the

19   night, any place where he fears that he could have access to the

20   internet or be exposed to anything on the internet.

21   Q.  So to your knowledge no efforts -- we've made efforts but he

22   has not taken us up on that to provide some counselling or

23   treatment for the child?

24   A.  That's correct.

25            MS. LAWLESS:  That's all I have for this witness, Your

1    Honor.

2              THE COURT:  Mr. Butler.

3              MR. BUTLER:  Just briefly.  Thank you, sir.

4                        CROSS-EXAMINATION

5    BY MR. BUTLER:

6    Q.  Detective, when you received the lead to Texas to the --

7    what I'm going to call John Doe in Texas, is that -- and you

8    investigated that, as you testified to; correct, sir?

9    A.  Correct.

10   Q.  And you went and, in the course of your investigation, you

11   learned that the teenager in Texas, John Doe Number 1, had

12   uploaded suggestive or nude photographs of himself into a public

13   domain; correct?

14   A.  Videos primarily but a few photographs.

15   Q.  I'm sorry.  I wasn't maybe -- I wasn't trying to be super --

16   but videos and photographs have been uploaded by him in a public

17   domain seeking out people that might be interested in homosexual

18   activity.  Is that a fair statement?

19   A.  I'm not sure if his sole purpose was to seek out but

20   certainly that was an element of it.

21   Q.  And that was -- in doing that, it wasn't just with

22   Mr. Newman that he had had correspondence, but he was putting

23   that out for anybody that may have been interested in that type

24   of activity; correct?

25   A.  Correct.

Hutchinson - Direct

1  Q.  Okay.  And in the course of that, obviously, Mr. Newman

2  found it in the public domain and there began a correspondence;

3  correct?

4  A.  Yes.

5          MR. BUTLER:  That's all the questions I have, sir.

6          MS. LAWLESS:  Nothing further, Your Honor.

7          THE COURT:  All right.  You may step down.  Thank you.

8          THE WITNESS:  Thank you.

9          MS. LAWLESS:  Your Honor, the United States would call

10  Homeland Security Investigation Special Agent Brad Hutchinson,

11  please.

12     (SPECIAL AGENT BRAD HUTCHINSON, called by the Government,

13  sworn.)

14                        DIRECT EXAMINATION

15  BY MS. LAWLESS:

16  Q.  Would you state your name for the record, please, and spell

17  your last name.

18  A.  Brad Hutchinson, H-U-T-C-H-I-N-S-O-N.

19  Q.  By whom are you employed?

20  A.  Homeland Security Investigations here in Louisville,

21  Kentucky.

22  Q.  And what is your position with HSI?

23  A.  Special agent.

24  Q.  How long have you been a special agent with HSI?

25  A.  Approximately five-and-a-half years.

1  Q.  And in the course of carrying out your duties and

2  responsibilities as a special agent with HSI, did you become

3  involved in the investigation that led to the charges brought

4  against Mr. Newman?

5  A.  I did.

6  Q.  Would you briefly, because the court has of course our

7  sentencing memoranda from both sides that outlines it, but just

8  briefly tell us your involvement early on in the case, please.

9  A.  Well, we received a lead from our HSI office out of Dallas

10 based on Detective Adcock's investigations and Special Agent

11 Nicky Johnson's, who was the co-agent in the case, and based on

12 the communications that Mr. Newman had with the victim in Texas,

13 that's when we pursued the investigation.

14 Q.  Did that involve execution of a search warrant?

15 A.  It did.

16 Q.  All right.  And did you recover Mr. Newman's cell phone

17 during the course of execution --

18 A.  Yes, ma'am.

19 Q.  -- of that warrant?  Did you later review the contents of

20 that cell phone?

21 A.  I did.

22 Q.  Okay.  And could you tell the court, please, what kinds of

23 things you were looking for or what you saw generally on the

24 phone.

25 A.  Numerous chats between Mr. Newman and various minors across

Hutchinson - Direct

1    the United States and overseas in Europe with age range from, I

2    believe, 12 years old to 17 years old.  Numerous sexually

3    explicit chats, sexually explicit photographs and videos were

4    exchanged between the victims and Mr. Newman.

5    Q.  All right.  In an effort to try and identify who exactly he

6    had been talking to and maybe acquiring or sharing child

7    pornography images with, what exactly did you do to gather that

8    information from the phone?

9    A.  I manually went through the entire phone and on the relevant

10   chats I took screen shots with a camera and in turn sent these

11   screen shots to various offices to investigate.

12   Q.  Okay.  And when you talk about relevant chats, when we were

13   trying to identify initially the potential victim pool here,

14   what were the criteria that you looked for in those chats in

15   order to sort of flag them?

16   A.  Definitely under age, meaning under the age of 18, videos

17   and pictures that were traded between the victims and

18   Mr. Newman.

19   Q.  Okay.  Could you tell us some of the applications that were

20   involved that were on Mr. Newman's phone that he had used to

21   communicate with minors.

22   A.  The majority were on an application called KIK.  There was

23   -- Snapchat was another application where several leads were

24   sent and an application called Grindr.

25   Q.  Okay.  In all of these applications, although they're

1  different, do they generally allow the same kind of online

2  activity, if you will, chatting and the ability to send back and

3  forth videos or still images?

4  A.  Yes, ma'am.

5  Q.  Okay.  Now, going back to when you were looking at the phone

6  for the first time and you said that you physically went through

7  and then you took pictures of the chats that were deemed to meet

8  sort of that criteria of underage people on the other side in

9  the exchange of child pornography; correct?

10  A.  Yes, ma'am.

11       MS. LAWLESS:  All right.  Your Honor, may I approach

12  the witness?

13       THE COURT:  Yes.

14  BY MS. LAWLESS:

15  Q.  Special Agent Hutchinson, I've just handed you a large stack

16  of red envelopes that are marked on the outside sealed, and they

17  are United States' proposed Exhibits 2 through 16.  Before we

18  came to court today did you have an opportunity to review the

19  contents of those?

20  A.  Yes, ma'am.

21  Q.  What do those envelopes contain?

22  A.  The screen shots of the photographs I took of the chats that

23  Mr. Newman engaged in.

24  Q.  This would include all of the material?  Nothing has been

25  redacted?

Hutchinson - Direct

1    A.  Right.

2    Q.  So they do include child pornography images; correct?

3    A.  Yes, ma'am.

4          MS. LAWLESS:  Your Honor, I would ask that those be

5    admitted under seal.

6          MR. BUTLER:  Your Honor, I do not object.

7          THE COURT:  All right.  They'll be admitted under

8    seal.

9          (Sealed Government Exhibits 2, 3, 4, 5, 6, 7, 8, 9,

10   10, 11, 12, 13, 14, 15, 16 admitted in evidence.)

11   BY MS. LAWLESS:

12   Q.  Special Agent Hutchinson -- excuse me -- so we've identified

13   here 2 through 16.  These are different victims and you

14   collected that information.  You mentioned that you also -- you

15   looked at everything on the phone; correct?

16   A.  I'm still in the process.

17   Q.  All right.  You're still in the process.  All right.  That's

18   what I wanted to talk to you about.  Have you made efforts

19   through looking at other applications and other information that

20   is contained on -- that was contained and still in digital

21   format on Mr. Newman's phone to identify other children with

22   whom Mr. Newman had contact?

23   A.  Yes.

24   Q.  All right.  And those efforts are ongoing; correct?

25   A.  They are ongoing.

1    Q.  I'm going to ask you about two specific things that have

2    gone on.  Were you able to identify through review of his phone

3    a person in Louisville, Kentucky, here in the Louisville area?

4    A.  Yes, ma'am.

5    Q.  Okay.  And which application was being used with regard to

6    that particular person?

7    A.  Grindr.

8    Q.  And what did you discover by looking at the communications

9    that were in the Grindr application?

10   A.  The chat indicated a meeting took place in February of 2015

11   between Mr. Newman and the minor victim and suggested that

12   sexual activity did take place during that meeting.

13   Q.  All right.  Were you and one of your partners or someone

14   else that works with you as an investigator/special agent with

15   HSI able to identify this child?

16   A.  Yes, ma'am.

17   Q.  And did the two of you interview him and a parent?

18   A.  Yes.

19   Q.  How old was this child when he was communicating with

20   Mr. Newman?

21   A.  Fifteen.

22   Q.  Fifteen at the time.  All right.  And what could you gather

23   from either interviewing the child or reviewing those chat texts

24   about what had occurred between Mr. Newman and that child?

25   A.  The child was pretty apprehensive in speaking with us, but

1    he did admit that sexual activity took place.  He didn't

2    elaborate much.  He didn't -- he was very nervous and didn't

3    make eye contact with us at all, and he just didn't want to talk

4    about it.

5    Q.  Did you make an offer on behalf of the United States

6    Government to provide or help them --

7    A.  Yes, we offered --

8    Q.  -- services to address these issues?

9    A.  Yes, yes, ma'am.

10   Q.  And did they accept that?

11   A.  They denied it.

12   Q.  When you reviewed the communications that were online, so

13   you said you talked to this young man and he -- how old was he

14   when you actually talked to him?

15   A.  Sixteen.  He would have been 16.  He turned 16 in April of

16   2015.

17   Q.  All right.  Looking at the chats -- and did he admit that he

18   had talked to somebody on Grindr and then met them?

19   A.  Yes.

20   Q.  Okay.  Could you please tell Judge Hale what the chat text

21   reveals occurred between the two of them.

22   A.  Basically, they agreed to meet at the child's apartment and

23   there was -- the chat was fairly brief compared to the other

24   chats I've went through but -- and then after the meeting was

25   engaged, the minor texted Mr. Newman.  I believe it's to the

1    extent it said, "The best sex I've ever had."

2    Q.  All right.  Now, with regard to --

3          THE COURT:  Just for clarification, are we speaking

4    about John Doe Number 1?

5          MS. LAWLESS:  No, sir, this is not a John Doe that's

6    charged.  This is somebody who hasn't been charged.  This is

7    other relevant conduct.

8          THE COURT:  I just wanted to clarify.  How old was

9    the -- was this person at the time of the sexual contact with

10   the defendant?

11         THE WITNESS:  Fifteen according to --

12         THE COURT:  Fifteen at the time of the -- all right.

13   BY MS. LAWLESS:

14   Q.  All right.  Special Agent Hutchinson, during the course of

15   continuing this investigation, and please correct me if I'm

16   wrong, but part of your responsibilities involve investigating

17   criminal conduct and bringing people to justice who have

18   violated federal crimes.

19   A.  That's correct.

20   Q.  Okay.  With regard to child sexual exploitation, is there

21   another component to that that involves identifying victims and

22   something completely separate from just the absolute criminal

23   investigation?

24   A.  Yes.

25   Q.  All right.  Would you please explain for the court what that

Hutchinson - Direct

1    involves.

2    A.   Basically, we act -- we inform the victims of their rights

3    as victims, whether that include to provide a victim impact

4    statement to the court, offering counselling services.

5         They also can be notified if there are actual child

6    pornography images of the victim that's out there on the

7    internet and, for instance, say make -- the National Center for

8    Missing and Exploited Children were to become aware, they

9    normally -- where they'll contact the agent of that case and

10   then if the victim or the victim's parents would like to be

11   notified that more images have turned up, we provide those

12   notifications also.

13   Q.   Okay.  So you mentioned the National Center for Missing and

14   Exploited Children.  As part of your responsibility, does that

15   involve gathering this kind of information, including newly

16   created child pornography, and submitting that to National

17   Center for the purpose of identifying victims --

18   A.   That's correct.

19   Q.   -- and providing them notice of their rights?

20   A.   Yes, ma'am.

21   Q.   Okay.  As part of that did you and I and Mr. Butler meet

22   with Mr. Newman to talk about the potential for other victims

23   that he might be able to help us identify?

24   A.   Yes.

25        MS. LAWLESS:  And, Your Honor, we did this under the

1    umbrella of a proffer agreement, but it's mentioned in the

2    defense sentencing memorandum, and I want to be perfectly candid

3    with the Court.

4    BY MS. LAWLESS:

5    Q.  Did Mr. Newman during our meeting talk about other people

6    that he had met in the Louisville area who were underage?

7    A.  Yes.

8    Q.  And based on your review of the Grindr application, you have

9    some information about this 15-year-old that led you to him.

10    Did that match with at least one of the people that Mr. Newman

11    told us about?

12    A.  Partially.

13    Q.  Okay.  He gave a general area of where he had met; correct?

14    A.  Yes.

15    Q.  And did he give us a name that ended up matching with the

16    screen name of the person?

17    A.  The screen name.

18    Q.  Special Agent Hutchinson, I want to turn your attention to

19    some leads that you talked about sending out to other divisions

20    similar to what -- the lead that you received from Texas about a

21    potential target, that being Mr. Newman here in the Louisville

22    area.

23    Did you send a lead to New York concerning information that

24    you retrieved from Mr. Newman's phone?

25    A.  I believe there were several to New York.

1    Q.   Okay.   To your knowledge have any of those been followed up

2    on?

3    A.   One has to my knowledge and they're all being actively

4    investigated to my knowledge.

5    Q.   Okay.   So that's -- when you told the judge earlier that

6    you're still going through this and the investigation continues,

7    is that what you were referring to?

8    A.   That's correct.

9    Q.   Okay.   I want to talk to you about the -- at least one of

10   the leads that was sent to New York.   Have you been in

11   communication with your counterpart, a special agent in the New

12   York office?

13   A.   On several occasions.

14   Q.   All right.   And what information did that special agent

15   provide to you?

16   A.   She provided -- she interviewed the victim.   I believe they

17   had a forensic interview also.   The child corroborated the

18   activity took place on Snapchat, this chat in particular, and

19   the child did admit to sending one sexually explicit image to

20   Newman, and that was the extent of the activity that took place.

21   Q.   Were you able to find that sexually explicit image on

22   Mr. Newman's phone?

23   A.   No, ma'am.

24   Q.   And tell us -- I don't expect you to be an expert on

25   Snapchat, but could you explain why it is we can find images in

1    certain applications but maybe not others?

2    A.   To my knowledge, Snapchat, once a video or an image is sent

3    to another user, there's -- unless the image is actually saved

4    in a matter of time or screen saved, the image or video self-

5    deletes itself.

6    Q.   What is that time frame?  Are we talking minutes or a few

7    seconds, like 10 or 20 seconds, something like that?

8    A.   I'm not sure of the time frame.

9    Q.   Okay.  After the notification was made with regard to at

10   least this one lead in New York, do you know whether the parents

11   of that child elected to submit a victim impact statement?

12   A.   I believe they did.

13   Q.   Okay.  And did they send it directly to me?  Have we talked

14   about this?

15   A.   Yes.

16        MS. LAWLESS:  Your Honor, that's all I have for

17   Special Agent Hutchinson.

18        THE COURT:  Mr. Butler.

19        MR. BUTLER:  Yes, sir.  Thank you.

20                     CROSS-EXAMINATION

21   BY MR. BUTLER:

22   Q.   Good afternoon, Agent.  I just want to kind of go through

23   some of the things that you did here.  You testified that you

24   got a lead and then ultimately you went to a federal judge and

25   sought a search warrant in this case; correct?

1    A.   Yes, sir.

2    Q.   And you executed that search warrant at Mr. Newman's home;

3    is that accurate, sir?

4    A.   Yes, sir.

5    Q.   And Mr. Newman was at home when you executed the search

6    warrant; correct?

7    A.   Yes, sir, he was.

8    Q.   And as you are required, you obviously read him his rights.

9    A.   Yes, sir.

10   Q.   You knew he was going into custody at that point in time;

11   correct?

12   A.   Yes, sir.

13   Q.   And he waived those rights; correct?

14   A.   He did.

15   Q.   And he chose to talk to you that day; correct?

16   A.   Yes, sir.

17   Q.   He went through screen names that he had explaining how he

18   would get on various -- Snapchat, KIKs, things like that.

19   A.   Uh-huh.

20   Q.   Is that accurate?

21   A.   Yes, sir.

22   Q.   One of the things in particular -- and I think you testified

23   to it on direct -- is a lot of this activity was through a

24   provider called KIKs; correct?

25   A.   Yes, sir.

1    Q.  And that at the beginning was the primary focus this KIK's

2    Messenger of your investigation?

3    A.  That's correct.

4    Q.  And you had asked him at that initial meeting at his home if

5    you -- if he could have permission to access his account by law

6    enforcement; correct?

7    A.  Yes, sir.

8    Q.  That in order to assist you-all in more readily acquiring

9    this information, if there was anything that needed to be acted

10   on, you had that available to you; correct?

11   A.  That's correct.

12   Q.  And he answered your questions that day; correct?

13   A.  He did.

14   Q.  He also discussed with you at length -- to the best of his

15   memory, he gave you names of people that he had what I'm going

16   to say are improper communications with through KIK; correct?

17   A.  He did provide us.

18   Q.  He gave you a laundry list of different -- I'm not going to

19   say their names in here, obviously, but to the best of his

20   knowledge, he gave you what he believed their ages to be.  Some

21   were 18 and over, some were under 18, in the teenage years;

22   correct?

23   A.  That's correct.

24   Q.  At least from the notes that I have from your statement.

25   A.  Yes, sir.

Hutchinson - Cross

1    Q.  And this all was done prior to any lawyers being involved,

2    any prosecutors being involved, other than I assume a prosecutor

3    reviewed the search warrant before taking it to a federal judge.

4    A.  Yes, sir.

5    Q.  He gave you permission to get in his DropBox account;

6    correct?

7    A.  Yes.

8    Q.  He gave you permission -- he gave you the user name and the

9    password so you didn't have to access it forensically.  And at

10   the conclusion of it, you even told him, "You've given us a lot

11   of information that may help us lead to other things."  Correct?

12   A.  Either myself or the detective that was in the interview, I

13   believe, maybe stated something to the effect.

14   Q.  I just wrote "detective" so I don't know if it was you or

15   him, but one of you said it.  You would agree; correct?

16   A.  Yes.

17   Q.  And following that -- that was a meeting on June the 2nd and

18   that was the day he was taken into custody; correct?

19   A.  I believe so.

20   Q.  And then three days later, at this point he had a lawyer and

21   we again met with yourself and this time with Ms. Lawless;

22   correct?

23   A.  Yes.

24   Q.  And we did that here at the federal courthouse at one of the

25   very first court appearances; correct?

1    A.   Yes.

2    Q.   And the purpose of this particular meeting was Mr. Newman

3    going through different websites/groups and trying to help

4    you-all identify how people that may be interested in this type

5    of online activity, how they would access other people and what

6    chat rooms and what ways they would go through it.  Is that

7    accurate?

8    A.   I believe so, yes.

9    Q.   And he gave you -- you were interested that day in his

10   iTunes password and user names.  He provided those to you

11   readily as well; correct, sir?

12   A.   He did.

13   Q.   And other things aside from KIKs, different chat rooms or

14   accessing apps, he gave you permission to access those as well;

15   correct?

16   A.   Yes, he did.

17   Q.   And then at Mr. Newman's request we all met again on July

18   30th, this time at the Oldham County Jail; correct?

19   A.   Yes, sir.

20   Q.   And, again, it was myself, Mr. Newman, Ms. Lawless, and you.

21   Correct, sir?

22   A.   That's correct.

23   Q.   We began that particular meeting and you had at this point

24   had an opportunity to investigate a little bit more as to the

25   different types of ways that you could get into these type of

1    chats and this type of sharing, and we discussed Grindr,

2    Snapchat, Instagram, Vine, Tinder and iTunes at the beginning of

3    our meeting that particular day.  Correct, sir?

4    A.  Yes, sir.

5    Q.  And you-all also asked him to consent to access all of those

6    different apps on his phone; correct?

7    A.  I believe -- I thought that was the first meeting but...

8    Q.  I think you asked him again to make sure you had --

9    A.  Okay.  Yes, sir.

10   Q.  -- to be clear, that you had access to everything.  And he

11   gave you that permission; correct?

12   A.  Yes, sir.

13   Q.  And, also, the purpose of that meeting was for Mr. Newman to

14   identify or help you identify anyone that he had had -- that was

15   under the age of 18 that he had had some sort of actual sexual

16   relationships with; correct?

17   A.  That's correct.

18   Q.  And he answered all of those questions; correct?

19   A.  Yes.

20   Q.  He advised you -- in fact, he advised you about -- and I'm

21   not going to give details, but an individual that he believed to

22   be 15 or 16 that was in Louisville.  That's the individual

23   ultimately you were able to identify through further

24   investigation; correct?

25   A.  Yes, sir.

Hutchinson - Redirect

1   Q.   Okay.  And it's fair to say he answered every question that

2   you had of him throughout those meetings, and as it got more --

3   as your investigation went further, you had more specific

4   questions and he attempted to answer those; correct?

5   A.   I would say he answered to the best of his knowledge.  I'm

6   curious why he didn't let us know on the first meeting about the

7   hands-on victims but second meeting he eventually did.

8   Q.   And with regard to that, did you learn subsequently at the

9   second meeting that I had advised Ms. Lawless that there were

10  actual sexual contact in the first meeting?  You may not know

11  that.

12  A.   I'm not -- I'm not sure.  I'm not aware of that.

13         MR. BUTLER:  I think she would tell the court that we

14  did.  So thank you, Agent.

15                    REDIRECT EXAMINATION

16  BY MS. LAWLESS:

17  Q.   Special Agent Hutchinson, you touched on something that I

18  want to ask you about now.  When you were at Mr. Newman's home

19  on June 2nd with the search warrant in hand, he was cooperative?

20  A.   Yes.

21  Q.   You'll agree with that?

22  A.   Yes, ma'am.

23  Q.   But was he asked specifically if he had ever met any

24  children in person for sex or to produce child pornography?

25  A.   I don't recall if he was specifically -- I would have to

Hutchinson - Redirect

1    review the notes.

2    Q.   Okay.  Well, let me talk to you about the criminal complaint

3    that -- the affidavit that you signed in support of that

4    criminal complaint, and there's a statement in there that he

5    denied ever having met a child in person.

6    A.   I recall that.

7    Q.   Would you have written that in your affidavit --

8    A.   No, I would not have.

9    Q.   -- if it wasn't true?

10   A.   Right, no.

11   Q.   Okay.  So he was asked that first day --

12   A.   Right.

13   Q.   -- and he told you no; correct?

14   A.   Yes, ma'am.

15   Q.   And he admitted that he had a sexual interest in boys ages

16   13 to 17 but denied that he had ever --

17   A.   Yes.

18   Q.   -- had any in-person contact?

19   A.   Right, yes, ma'am.

20   Q.   Then Mr. Butler just asked you about that first proffer that

21   we had on June 5th.  Was there ever any discussion at all during

22   the course of that meeting -- we were downstairs on the hallway

23   outside of the Courtroom 4 -- about him having any sexual

24   contact with minors during that first proffer in the courthouse?

25   A.   I don't believe we had -- no, I don't believe we

Hutchinson - Redirect

1   discussed --

2   Q.  Did you follow up and try to find any children after we had

3   that meeting --

4   A.  Absolutely.

5   Q.  -- based on what he said?

6   A.  Absolutely.

7   Q.  Based on what he told you or on your investigation from his

8   phone?

9   A.  On my investigation.

10  Q.  Okay.  Because this is important.

11  A.  Right.

12  Q.  He didn't tell us anything about who he had met or where

13  they were from either the first time you interviewed him or the

14  second time you --

15  A.  That's correct.

16          MS. LAWLESS:  Okay.  I will -- as an officer of the

17  court, Your Honor, I will tell you that Mr. Butler shared with

18  me concerns with regard to the proffer because his client had

19  told him that he had met some people in person.  We did not

20  include that.  I did not discuss it with Special Agent

21  Hutchinson because we were trying to get more to whether there

22  were other adults that were involved.

23      My only request to Mr. Butler was that during the detention

24  hearing that followed he not represent to the court that there

25  weren't any children that he had met in person, and he honored

1    that request.  We were sharing information with one another in

2    the course of the case, but it was not necessarily known and

3    there were no details given to me at that time.

4          THE COURT:  All right.  Do you have anything to add on

5    that discrete point, Mr. Butler?

6          MR. BUTLER:  No, Your Honor.  I went to Ms. -- as an

7    officer of the court, I went to Ms. Lawless and we were in the

8    conference room of this courthouse.  That was three days after

9    Agent Hutchinson had arrested him.  I advised her that there

10   were going to be actual sexual contact with underage teenage

11   boys.  We agreed not to discuss that at the first proffer.

12       At our request we did a second proffer approximately a month

13   and a half later, and the primary purpose of the second proffer

14   was to assist Agent Hutchinson in detailing everything that had

15   happened.

16       The first proffer was focused on the Snapchats and the KIKs

17   and how they get into them and how they may follow up and see if

18   there's other people that they could catch that were involved in

19   this type of activity.

20         THE COURT:  All right.  Thank you.

21   BY MS. LAWLESS:

22   Q.  Coming back to that timeline, Special Agent Hutchinson, so

23   between -- when we met with Mr. Butler and Mr. Newman here in

24   the courthouse and then when we went to the Oldham County Jail

25   and sat down with him, during that intervening time had you

1   already identified through reviewing the chats and the images

2   that we've introduced here --

3   A.  Yes.

4   Q.  -- in United States Exhibit 2 through 16, had you identified

5   what you believed to be a child that lived in the Louisville

6   area with whom Mr. Newman had been communicating and had met on

7   multiple occasions and produced child pornography with?

8   A.  Yes.

9   Q.  Yes?

10  A.  Yes, ma'am.

11  Q.  And that was without Mr. Newman's assistance at all?

12  A.  Correct.

13  Q.  Correct?  Other than the fact that --

14  A.  Correct.

15  Q.  -- we had his phone from a search warrant and he gave us

16  some additional details?

17  A.  That's correct.

18  Q.  Okay.  So that -- all of that information we already knew

19  and had identified and were moving forward?

20  A.  Yes.

21          MS. LAWLESS:  Okay.  That's all I have, Your Honor.

22          THE COURT:  Anything further, Mr. Butler?

23          MR. BUTLER:  Just for clarification.

24                      RECROSS-EXAMINATION

25  BY MR. BUTLER:

1    Q.  At that point you were aware of one individual.  When we met

2    on July 30th, he told you that there were others and gave you

3    all the information that he had to try to help you, assist you

4    in identifying those people?

5    A.  That's correct.  The July 30 was the Oldham County Jail?

6    Q.  Yes, sir.

7    A.  Okay.  We were aware of the first victim.

8    Q.  But there were -- he told you on July 30th that there were

9    others?  I mean --

10   A.  That's correct.

11            MR. BUTLER:  Thank you.

12            MS. LAWLESS:  That's all I have, Your Honor.

13            THE COURT:  All right.  Anything further by way of

14   witness testimony?

15            MS. LAWLESS:  One witness in response to one of the

16   letters, Your Honor.  I don't know if you want Mr. Butler's

17   witness or you want me to go ahead and put my witness on.

18            THE COURT:  No, you can go ahead and finish.

19            MS. LAWLESS:  Thank you.  You can step down, Special

20   Agent Hutchinson.

21       Your Honor, the United States calls Brian Reynolds,

22   Dr. Brian Reynolds.

23       (DR. BRIAN REYNOLDS, called by the Government, sworn.)

24                        DIRECT EXAMINATION

25   BY MS. LAWLESS:

1    Q.  Good afternoon.  Would you state your name for the record,

2    please, and spell your last name.

3    A.  Brian Reynolds, R-E-Y-N-O-L-D-S.

4    Q.  By whom are you employed?

5    A.  I work for the Catholic Archdiocese of Louisville.

6    Q.  And what is your position with the Archdiocese?

7    A.  Chancellor.

8    Q.  All right.  Dr. Reynolds, you and I talked earlier this week

9    about a letter that had been submitted in support of Mr. Newman

10   from someone identified as Reverend William K. Miller.  Do you

11   remember that conversation?

12   A.  Yes, I do.

13   Q.  Okay.  I didn't send you the letter at the time, and I think

14   I even told you that it was under seal but that I needed to ask

15   you some questions.

16   A.  I haven't seen it.

17            MS. LAWLESS:  Okay.  Your Honor, may I approach the

18   witness and give him just a moment to look at it?

19            THE COURT:  Yes.

20      (Handing document to witness.)

21            THE WITNESS:  Okay.

22            MS. LAWLESS:  Thank you.

23      If the record could reflect, Your Honor, that I've handed

24   Dr. Reynolds Defense Exhibit 2 that was filed with the

25   sentencing memorandum and he's had an opportunity to review it.

Reynolds - Direct

1   BY MS. LAWLESS:

2   Q.   Dr. Reynolds, could you please tell the court what

3   Reverend Miller's current status with the Louisville Archdiocese

4   is?

5   A.   He's a retired priest and does have an assignment now.

6   Retired priests often help out but they don't have a particular

7   assignment.

8   Q.   Okay.  How long has he been retired?

9   A.   Just about ten years.  2006 he retired.

10  Q.   All right.  And how old is Reverend Miller?

11  A.   He's 80.

12  Q.   Okay.  During the time -- how long have you worked for the

13  Archdiocese?

14  A.   Twenty-six years.

15  Q.   During the course of your employment with the archdiocese,

16  have you ever been aware of Reverend Miller engaging in therapy

17  or assessment under the umbrella of the archdiocese here in

18  Louisville?

19  A.   Not personally aware.  During the 1970s and 1980s, the

20  Archdiocese had a counselling center, and a number of our active

21  pastors -- he was a pastor at the time -- may have served in

22  that center with some of their time in order to be of assistance

23  as a counsellor.  Father Miller has a degree in counselling

24  besides his theological training, and priests who have that

25  training often helped out at the center.  Specifics on when he

Reynolds - Cross

1    did that I do not know.

2    Q.   Okay.  Since you have been with the Archdiocese has he been

3    actively involved in an assignment as a counsellor other than

4    what might come during the course of actually being the pastor

5    of a particular parish?

6    A.   No, he was not.

7    Q.   That particular letter, Dr. Reynolds, now that you've had an

8    opportunity to read it and when we had discussed it before, was

9    that written with the permission or as a position being taken by

10   the Louisville Archdiocese or is it something that is his

11   personal opinion based on his interpersonal relationship with

12   Mr. Newman?

13   A.   It's a personal letter from Father Miller directly.

14   Q.   So it's not on behalf of the Archdiocese or the Roman

15   Catholic church?

16   A.   No, no individual speaks -- no individual priest speaks in

17   that capacity.

18        MS. LAWLESS:  Thank you.

19      That's all I have, Your Honor.

20        THE COURT:  Mr. Butler.

21        MR. BUTLER:  I just have one question.

22                    CROSS-EXAMINATION

23   BY MR. BUTLER:

24   Q.   Father's Miller's retired but he still presides at mass at

25   Our Lady of Lourdes on a frequent basis when other priests can't

Breeding - Direct

1    be there, at least when I'm there he does.

2    A.   Yes, yes, correct, retired priests does what we call supply

3    help.  When a priest is on vacation or is away, he may serve in

4    an occasional capacity.  I don't know exactly how many times it

5    occurs, but each individual priest who's retired is free to do

6    that and most of them do and I know Father Miller does.

7              MR. BUTLER:  Thank you, sir.

8              MS. LAWLESS:  Thank you all I have, Your Honor.

9              THE COURT:  Okay.  Thank you.

10        Any further testimony from the United States?

11             MS. LAWLESS:  No, sir.

12             THE COURT:  Mr. Butler.

13             MR. BUTLER:  Your Honor, if we could call David

14   Breeding, sir.  He should be in the hallway.

15             THE COURT:  All right.

16        (DAVID BREEDING, called by the defense, sworn.)

17             MR. BUTLER:  May I proceed, Your Honor?

18             THE COURT:  Yes, please go ahead.

19                        DIRECT EXAMINATION

20   BY MR. BUTLER:

21   Q.   Sir, can you introduce yourself to the court, please.

22   A.   My name is David Breeding.

23   Q.   And, Mr. Breeding, can you tell the court what your training

24   and experience is as it relates to conducting sex offender

25   evaluations.

Breeding - Direct

1    A.   Okay.   I'm a licensed marriage and family therapist in

2    Kentucky, and I'm an approved provider through the Sex Offender

3    Risk Assessment Advisory Board here in Kentucky under Megan's

4    Law, KRS Chapter 17, to provide comprehensive presentencing sex

5    offender evaluations for felony state cases and to provide sex

6    offender treatment services for individuals who are on probation

7    or parole or conditional discharge here.

8    Q.   Sir, can you tell the court which federal and state agencies

9    that you've provided sex offender evaluation treatment for.   I

10   mean, obviously, you testify on behalf of defendants, but can

11   you tell the court which government agencies that you've done

12   this service for.

13   A.   Well, I've done evaluations for the Cabinet For Health and

14   Family Services, Department For Social Services here in

15   Kentucky, and for the Commonwealth in many prosecution cases and

16   for defense counsels.   And I've done evaluations for, you know,

17   the court-ordered sex offender risk assessments for

18   presentencing use.   And, also, I'm a contract sex offender

19   treatment provider for the U.S. Probation Office here in

20   Louisville, and we provide sex offender treatment for their

21   clients.

22   Q.   So courts -- through probation the courts refer people to

23   sex offender treatment and you and your group are --

24   A.   That's correct.

25   Q.   -- responsible for providing therapy for them?

Breeding - Direct

1    A.   That's correct.  We're on a list of approved providers of

2    sex offender evaluation and treatment here in Kentucky.

3    Q.   And, sir, did you also previously have a role with the

4    Kentucky State Parole Board regarding sex offenders and the

5    parole process?

6    A.   I spent six years working in the sex offender treatment

7    program at Kentucky State Reformatory as a therapist.  And in

8    that capacity, when any of our clients went up for parole, we

9    had to do a risk assessment similar to the comprehensive

10   presentencing sex offender evaluation to submit to the parole

11   board, and it's called a parole report.  And so that was

12   something that was the equivalent of a risk assessment for

13   everybody that went up for parole hearings that were in the sex

14   offender treatment program at the time.

15   Q.   Okay.  And can you tell the court, prior to getting into

16   your actual tests that you conducted in this case, what were you

17   provided to review in this case by me?  What were you provided

18   to review in this case by me, sir?

19   A.   You had asked me to come and render an evaluation of

20   Mr. Newman that followed the protocol for the comprehensive

21   presentencing sex offender evaluations as set forth by the Sex

22   Offender Risk Assessment Advisory Board here in Kentucky.

23   Q.   And you were provided -- I provided you the chats, and the

24   screen shots, and the exhibits, and the United States'

25   sentencing memorandum, as well as the discovery they provided in

Breeding - Direct

1    this case, at least the public portion of the discovery that

2    we're allowed to pass out?

3    A.   That's correct.

4    Q.   Now, with regard to the work you did here, sir, I asked you

5    if there was an objective way to evaluate Mr. Newman that did

6    not involve so much your opinion versus somebody else's opinion.

7    Are there objective tests that have been peer reviewed that you

8    can administer to someone that has been convicted of a sex

9    offense to give the court some idea of likeliness to be a

10   recidivist?

11   A.   Well, here in Kentucky, under the rules adopted by the Sex

12   Offender Risk Assessment Advisory Board for the comprehensive

13   presentencing sex offender evaluations that I'm approved to do,

14   they have adopted two actuarial risk assessment instruments for

15   use in those evaluations.  I used those two, one being the

16   Static 2002, Revised Version.  The original approved instrument

17   was the Static-99.  They revised that.  It's now the Static

18   2002, IRU Stat in this evaluation.

19        The other one is the Minnesota Sex Offender Screening Tool

20   Revised, and that is also part of the protocol approved by the

21   Sex Offender Risk Assessment Advisory Board.  So for consistency

22   with that standard, I used those two in this evaluation.

23   Q.   And if you can, sir, let me just start with this Static

24   2002-R.  If you can explain to the court when you -- how does

25   that work?  What types of questions are asked?  Does a lot of

Breeding - Direct

1    your opinion get into the evaluation or the grading of this

2    test?

3    A.   The items on that risk assessment instrument were research

4    derived and it's not a matter of opinion of the evaluator.  As a

5    matter of fact, the opinion of the evaluator doesn't have much

6    of any place in that instrument at all.

7         It's whether or not certain aspects or factors are present,

8    and if they're present, that you score it one way, and if

9    they're absent, you score it another way.

10        And it's a matter of is it there or not?  And you total the

11   score and then that gives you a breakdown of the risk levels,

12   and that's how the Static 2002 -- and then the Minnesota Sex

13   Offender Screening Tool is the same way.  It's an actuarial

14   instrument and they used research and recidivism in sex

15   offenders after they had been released to determine what

16   differentiated -- what kind of factors differentiated the

17   recidivists from the non-recidivists in a follow-up study.  And

18   so it's, again, presence or absence of the factors.

19   Q.   So if you can give us -- you know, I'm not asking you to

20   read the entire thing, but give us an idea of like what types of

21   questions are on this -- is it something that's subject to

22   Mr. Newman manipulating the result to try to get a more

23   favorable outcome?

24   A.   Well, I brought with me the scoring sheets and I can just go

25   over the Static -- you asked about the Static and it has to do

Breeding - Direct

1   with age at release.  And there's a section called Persistence

2   of Sexual Offending, and it talks about prior sentencing

3   occasions for sexual offenses.  And if there's -- you score it

4   how many there are.  There's zero, which is in his case, and

5   then there are any juvenile arrests for sexual offense and

6   convicted as an adult for a separate sex offense.  That wasn't

7   present.  So it's present or absence.

8       Down here, any male victim?  Yes.  So that's scored one.

9   Any sentencing occasion for noncontact sex offenses?  Yes,

10  that's here today.

11      And in relation to victims, any unrelated victim scores a

12  point.  We had those here.  Any stranger victim and they define

13  that as somebody who you knew less than 24 hours prior to

14  committing a sex offense.  That is yes and that scores a point.

15      So that's the kind of things.  There's a piece on general

16  criminality, any prior involvement with the criminal justice

17  system.  It's either yes no.  Prior sentencing occasions for

18  anything and that's zero here.  Any community supervision

19  violation?  Well, he hasn't been on that so, no.  And years free

20  prior to the index sex offense, and that was more than 36 months

21  free prior to committing the sexual offense that resulted in the

22  index conviction and that's a zero as well.  So it's presence or

23  absence.  He scored a four on that instrument and that puts him

24  in the low-moderate risk category.

25  Q.  Okay.  Let me stop you there.  Can you tell the court what

1    categories there are with regard to this test when you score it.

2    A.   The Static has -- there's a breakdown of low and then low-

3    moderate, then moderate, then moderate-high and then high.

4    Q.   And, again, for brevity and clarification purposes, this

5    test was developed and it's been peer reviewed based upon

6    studies of convicted sex offenders?

7    A.   That's correct.

8    Q.   And to see, when they came back in the criminal justice

9    system, what differentiated them from the people that did not

10   come back?  Is that a fair assessment?

11   A.   Right, for people who had new sex offenses after having been

12   convicted for one and being released.  And then it looked -- it

13   looks at criminal history, you know, history of violent offenses

14   and so forth from there.

15   Q.   And you also said, aside from the Static 2000-R [verbatim],

16   that you administered a Minnesota Sex Offender Screening.

17   A.   Yes.

18   Q.   And is that also a test that is commonly used by -- in sex

19   offender evaluations in various criminal justice systems

20   throughout the country?

21   A.   That's correct, it's been in use for a long time and it's

22   the same thing.  It's presence or absence of things in the past,

23   like number of sex-related convictions, including the current

24   one.  Well, he has -- he has one conviction here today by virtue

25   of his plea.

Breeding - Direct

1      And it's like, was any sex offense charged or convicted

2    committed in a public place?  In this case it's no.  And it

3    is all yes/no.  This instrument is total yes/no, except for item

4    number 12, and that talks about was there stable employment

5    history in the 12 months prior to his arrest, and in that case

6    there was "yes."

7    Q.  And can you tell the court what his score on that particular

8    test was and what category that places him in.

9    A.  His score on that instrument was a plus one, which put him

10   in the low risk level.  There are three and these translate to

11   community notification levels in Minnesota, and the first level

12   is the low risk and he scored in that.  That's zero to three or

13   a score of up to three.  You can actually score a minus number

14   on this instrument.

15   Q.  So in this particular test, the result was he was a low risk

16   to re-offend?

17   A.  That's correct.

18   Q.  And in the other test, the empirical test, it was a low-

19   moderate risk and there are five categories?

20   A.  That's correct.

21   Q.  I guess that's the second from the bottom?

22   A.  The caveat here is that this is a risk assessment for hands-

23   on or contact sex offenses.  These instruments haven't been --

24   they were not designed for noncontact sex offenses.

25   Q.  And based upon your administering these two particular

Breeding - Direct

1    standardized tests, which are used in various criminal justice

2    systems throughout the country, did you find him to be a high

3    risk or not a high risk to re-offend with sexual contact?

4    A.   The cut that is spelled out for use by the Sex Offender Risk

5    Assessment Advisory Board here in Kentucky is cut between at

6    high risk or not at high risk, and so I followed that rule and

7    the finding was not at high risk.

8    Q.   Now, aside from administering these tests, can you tell the

9    court how many times that you met with Mr. Newman.

10   A.   I met with Mr. Newman on five occasions.

11   Q.   Did it take five separate occasions to administer these

12   tests for the sex offender evaluation?

13   A.   No, it didn't.  Those are -- that's scored by history.  It

14   doesn't take five.  What I wanted to do is familiarize myself

15   with the background in Mr. Newman's case, and also, he had

16   requested through you to have some therapeutic contact.  And so

17   those five were a combination of evaluation, interview, and

18   therapy session.

19   Q.   And my final question to you, sir, is based upon those five

20   meetings with Mr. Newman, was he a willing participant in

21   therapy in seeking your help and trying to deal with the issues

22   that has him before this court?

23   A.   Yes, he was.  That's one of the dimensions that's called for

24   in the comprehensive presentencing sex offender evaluation is

25   amenability to treatment.  And so a part of the evaluation is to

```
 1    test for or look for signs of amenability to treatment and
 2    that's transparency, willing to come forward, and a lack of
 3    attempt to manipulate or presence of attempt to manipulate the
 4    therapist.  And it also gets into his history of antisocial
 5    behavior.  You have to do a clinical interview to look at a lot
 6    of that but -- so he -- I found him to be very amenable to
 7    treatment by virtue of his transparency and his willingness to
 8    disclose and his desire for assistance and help.
 9              MR. BUTLER:  Thank you, sir.
10         Thank you, Your Honor.
11              THE COURT:  Ms. Lawless.
12                        CROSS-EXAMINATION
13    BY MS. LAWLESS:
14    Q.  Mr. Breeding, you are a licensed marriage family therapist;
15    is that correct?
16    A.  Yes, ma'am.
17    Q.  You have a master's degree in that.  You're not a
18    psychologist?
19    A.  No.
20    Q.  Not a psychiatrist?
21    A.  No.
22    Q.  And none of your educational background specifically trains
23    you to work with sex offenders, did it, your educational
24    background?
25    A.  That is -- here in Kentucky you have to be a licensed mental
```

Breeding - Cross

1    health professional in order to qualify to be certified to do

2    sex offender evaluation and treatment.  And the qualification

3    standards are that you have to have at least 40 hours of

4    training, which -- specific to evaluation and treatment of

5    sexual offenders and then two years of practice doing evaluation

6    and treatment as a minimum.

7    Q.   So that can be gained through what you choose to do but not

8    a specific educational path is my question.

9    A.   That's correct.  I'm -- that is correct.

10   Q.   Okay.  Mr. Butler asked you about your testimony in other

11   courts and including this court.

12   A.   Yes.

13   Q.   And you talked about a tremendous amount of work in the

14   state court system, it sounded like to me, but you have

15   testified in federal court in this court before, haven't you?

16   A.   Yes.

17   Q.   How many times would you estimate that you have testified in

18   this district?

19   A.   In this district, I looked at the cases that I have done

20   prior to coming in here today, and I have that I have testified

21   here in this district -- and that includes, of course, Bowling

22   Green, and Paducah, and Owensboro; correct?

23   Q.   Yes, sir.

24   A.   I have 13 cases that I've had.

25   Q.   Okay.  Of those 13 times that you've testified in this

Breeding - Cross

1   court, have you ever testified for the prosecution?

2   A.   No.

3   Q.   You have always testified on behalf of the defense?

4   A.   That's correct.

5   Q.   And you are paid to testify; correct?

6   A.   That's correct.

7   Q.   Okay.  Now, Mr. Breeding, in those 13 times that you have

8   testified, have you undertaken a similar approach in evaluating

9   the individuals that were before the court for sentencing?

10  A.   You mean as far as the actual protocol for the evaluation?

11  Q.   Yes.

12  A.   Yes, I have.

13  Q.   Did you deviate from it at any time?

14  A.   No, I did not.  There was one that I did back in 2000 and

15  that was before I was approved as a provider under the -- by the

16  Sex Offender Risk Assessment Advisory Board.

17  Q.   Okay.  But --

18  A.   So at that time I hadn't been trained in the use of these

19  actuarial instruments.

20  Q.   So you had been using these instruments in all of them

21  except for one?

22  A.   Yeah, ever since.

23  Q.   Would you agree with me that while the Static now 2002-R

24  used to be the Static-99?

25  A.   Yes, ma'am.

1    Q.   That it has been in pretty consistent state of flux for the

2    last 15 years?

3    A.   That's true.

4    Q.   Okay.  So while you're here telling the court that it's been

5    developed and you have these standards, it's not as if those

6    standards have been in place without change for the last 15

7    years?

8    A.   The standards, which kind?  The standards by the rules for

9    the comprehensive presentencing sex offender evaluation haven't

10   changed.

11   Q.   No, sir, I'm not talking about what Kentucky requires.

12   A.   Okay.

13   Q.   I'm actually talking about these tools, the Static-99.

14   A.   Okay.

15   Q.   Not everyone who works with sex offenders agrees that this

16   is the most accurate way to predict future dangerousness because

17   the standards have been in flux.  Would you agree with that?

18   A.   There has been some research in that area.  Most of it's

19   been favorable.  As a matter of -- that's why the Static was

20   revised, to make it more accurate.

21   Q.   And it's been revised multiple times over the course of the

22   last 15 years?

23   A.   That's true.

24   Q.   Okay.  When was the last time that you testified in U. S.

25   District Court in the Western District of Kentucky?

1    A.   It looks like 2009.

2    Q.   Okay.  So --

3    A.   Well, actually, my partner testified in that case so it

4    would be 2008.

5    Q.   So you haven't testified in this district for about seven

6    years or so?

7    A.   That's correct.

8    Q.   Okay.  Going back to the times that you have testified --

9    and you said that you used the same tools.

10   A.   Yes, ma'am.

11   Q.   Correct?  Have you ever testified in this court, in

12   reviewing a dozen or 13 people, that any of them posed a future

13   risk of dangerousness to the community?

14   A.   Yes, I have.

15   Q.   And which case that would be?

16   A.   That would have been James Moore in 2006.

17   Q.   Tell us about that, please.

18   A.   Well, that individual had a strong history of molesting

19   children, multiple prior sex offenses, and he showed some

20   characteristics of antisocial personality disorder.

21       Now, that's not part of the item content in these risk

22   assessment instruments but it is a -- if it's present, it can

23   elevate the risk and that's kind of well known throughout the

24   field.

25   Q.   Okay.

Breeding - Cross

1    A.   So I found him to be at high risk.

2         There was a person named David Groves that I testified in

3    Paducah, and I found him to be at high risk for noncontact sex

4    offenses.  That was a clinical opinion of mine based on the

5    large, long history he had of noncontact offenses.  He was

6    chatting with minors on the internet.

7    Q.   And when was the *Rose* case?

8    A.   Pardon?

9    Q.   When did you testify in the *Rose* case?

10   A.   The *Groves* case, that was '06.

11   Q.   Okay.  And you said that was based on a long history of his

12   online activity?

13   A.   Right.  The actuarial instruments found him to be low risk

14   for contact sex offenses, actually hands-on.  I was speaking to

15   the likelihood that I felt like that he would be to recommit

16   noncontact like internet-type offenses.

17   Q.   And you base that just on your opinion?

18   A.   That was clinical judgment.

19   Q.   Okay.  So all of these other people that you looked at who

20   may have -- do you remember Mr. Berry, for example?

21   A.   I do remember Mr. Berry.

22   Q.   Who had hundreds of thousands of child pornography?

23   A.   That's correct.

24   Q.   And he told you that had he had written a program to go on

25   the undernet and search specifically for child pornography.

1    A.   That's true.

2    Q.   But you testified that you didn't think that he would be a

3    future risk of re-offending?

4    A.   That was for hands-on contact sex offenses.

5    Q.   Okay.  So you're --

6    A.   That's all these instruments predict is the likelihood of

7    actually molesting or committing a sex offense against a person.

8    Q.   But you were willing in Mr. Groves' case to deviate from

9    that and insert your opinion.

10   A.   That's true.

11   Q.   And you did that, you said, when?  I'm sorry.  I missed it.

12   Mr. Groves, 2000 and what?

13   A.   Groves, 2006.

14   Q.   Okay.  Mr. Berry was after that and yet no opinion offered

15   to the court to give some insight with regard to people who

16   write programs and amass a collection of over 300,000 images,

17   that he might pose a risk of future dangerousness for that

18   activity?

19   A.   I was -- I was asked to stick religiously to the protocol

20   for the comprehensive presentencing sex offender evaluations and

21   that's not part of that protocol.

22   Q.   Well, except, Mr. Breeding, you keep talking about that

23   protocol and that's in the Commonwealth of Kentucky court

24   system.

25   A.   Yes.

Breeding - Cross

1   Q.  Not in this court.  And you come in here as a mental health

2   provider and represent yourself to be authorized by this court,

3   which you are.

4           MR. BUTLER:  Objection to argument.  I mean, it's not

5   a question.

6           MS. LAWLESS:  I'll get to my question.  I apologize,

7   Judge.

8   BY MS. LAWLESS:

9   Q.  So Judge Hale is supposed to believe what you say today

10  because in part you provide treatment to sex offenders from this

11  court, but you don't always tell the court what you find during

12  the course of your assessments, do you?

13  A.  Well, I try to stick to the referral question.

14  Q.  Because they're paying you and you're going to do what they

15  ask you to because they're paying you?

16  A.  The referral question is what you stick to when somebody

17  sends -- I want you to do an evaluation.  I want you to use the

18  protocol for -- and that's been typical when I get a case

19  referred, to stick to that protocol for the state risk

20  assessments.

21  Q.  But, Mr. Breeding, you and I have met in this exact exchange

22  before --

23  A.  Oh, yes.

24  Q.  -- many times, and I have asked you over and over again.

25  And you will always say there's no way to predict --

Breeding - Cross

1           MR. BUTLER:  Argumentative.

2           THE COURT:  If you-all would approach, please.

3       (Bench conference on the record.)

4           MR. BUTLER:  Judge, I would object to the

5   argumentative question.  I mean, if she has a question, she

6   should ask it, but she's just giving a speech.

7           THE COURT:  Your response.

8           MS. LAWLESS:  I'll try to get to it, Judge.  It's hard

9   because he won't answer my questions directly.

10          THE COURT:  I'm going to overrule the objection but --

11          MS. LAWLESS:  I'll rein him in.

12          THE COURT:  Well, I think you've made your point.

13          MS. LAWLESS:  Okay.

14          THE COURT:  I mean, you don't have a jury here and so

15  I see the points that you're making regarding his reliance and

16  his -- I see the points you're making.  And you'll have a chance

17  to redirect, if you would like.

18          MR. BUTLER:  Yes, sir.

19      (End of bench conference.)

20          MS. LAWLESS:  Your Honor, did I understand that you

21  overruled the objection?

22          THE COURT:  Yes.

23          MS. LAWLESS:  All right.

24  BY MS. LAWLESS:

25  Q.  I'm going to move to something different though,

1    Mr. Breeding, because I think I might have beaten that horse

2    just a little too long.

3        I'm going to ask you about two specific cases, and it

4    relates to what you've testified about.  And you said that you

5    have a list of the cases in which you have offered an opinion in

6    this court about future risk of dangerousness.  One was

7    Mr. Berry and do you remember what you told the court then?  He

8    was at a low risk for re-offending; right?

9    A.  I was referring to actual hands-on sex offending.

10   Q.  Okay.  But he was being sentenced, was he not, for online

11   child pornography offenses?

12   A.  That's correct.

13   Q.  Okay.  And you told the court he was at a low risk to

14   re-offend.  There was no caveat given; correct?

15   A.  I don't know whether I specified.  I don't have that with

16   me.

17   Q.  Would you like to see the transcript from your testimony?

18   A.  Just if I could have a question, I'll be glad to answer it.

19   Q.  Isn't it true that you told Judge Coffman that he was at a

20   low risk to re-offend?

21   A.  I did say that.

22   Q.  Okay.  Would it surprise you that he has already been

23   revoked on his supervised release and facing additional charges

24   for that exact same conduct?

25   A.  I know that.

Breeding - Cross

1    Q.  So it's not going to surprise you because your partner has

2    been providing treatment for him; correct?

3    A.  As have I.

4    Q.  As have you, okay.  So that prediction was wrong.

5    A.  Well, he didn't commit a hands-on sex offense and I'm right

6    on that one.

7    Q.  But he re-offended in the same way that he was before the

8    court the last time, didn't he?

9    A.  I have learned to be specific when I say contact versus

10   noncontact by virtue of that very kind of thing.

11   Q.  Same thing with Mr. Duane.  Do you remember John Joseph

12   Duane?

13   A.  Yes.

14   Q.  Okay.  And you testified probably in the other courtroom.

15   Do you remember that testimony?

16   A.  I would be hard put to remember the words of that testimony,

17   but I'm sure it's on record so --

18   Q.  Do you remember having any exchange with the presiding

19   judge, who would have been Judge Simpson?

20   A.  It's been a long time.

21   Q.  Do you remember talking to Judge Simpson about the fact that

22   your opinion generally was that online child pornography

23   offenses are victimless crimes, and he took issue with that and

24   you-all had quite a heated discussion about that?

25   A.  Yes, I remember that discussion, yes.

1    Q.  And do you remember also testifying in that case that you

2    thought that Mr. Duane was at a low risk to re-offend?

3    A.  That's before I learned to separate the re-offend sex --

4    physically, you know, hands-on from noncontact sex offenses like

5    on the internet.

6    Q.  Same question with regard to Mr. Duane as with regard to

7    Mr. Berry.  He in fact has been revoked twice for violating the

8    terms of his supervised release, hasn't he?

9    A.  I knew that, had him in treatment.

10   Q.  Okay.  You don't have a crystal ball, do you, Mr. Breeding?

11   A.  No, and I don't have a device that sees around corners

12   either so...

13   Q.  And yet you're here offering the opinion about the

14   likelihood of this man to re-offend?

15   A.  Actually, I'm here talking about what the actuarial

16   instruments' findings were, and I've chosen to lay off of giving

17   an opinion about it.

18   Q.  I see.  You mentioned Mr. Moore and then you also talked

19   about, I think, although I couldn't write down very quickly, how

20   many items you look at when you're conducting your evaluation,

21   but with regard to Mr. Moore that you said you testified that he

22   was at a high risk to re-offend.  It's because he had a history

23   of contact offending.  Had he been in contact with more than 16

24   people to produce child pornography?

25   A.  You know, I don't remember.

1    Q.   Okay.

2    A.   That's ten years ago.

3    Q.   Mr. Breeding, I'd like to talk about your report, please.

4    One of the things that you mention in here with regard to

5    Mr. Newman's account of the index offenses and then psychosocial

6    information, you talk about in one paragraph three in-person

7    encounters --

8    A.   Yes.

9    Q.   -- with children, but then in the next paragraph, you talk

10   about how Mr. Newman said that there had been four boys.  Do you

11   recall which is correct, three or four?

12   A.   One of those was over 18.  That's the fourth one.

13   Q.   Okay.  So he considers somebody over 18 a boy still?  Four

14   boys?

15   A.   Well --

16   Q.   He considers an 18-year-old a boy, is that what you-all

17   talked about?

18   A.   He's not considered a minor anymore, the 18-year-old.

19   Q.   But you also talked to Mr. Newman about his age appropriate

20   sexual encounters.

21   A.   Yes.

22   Q.   And that's more than four, according to your report.

23   A.   Let me get clear on what you're asking, Ms. Lawless.  I want

24   to be on the money with your questions and --

25   Q.   I understand.  I'm trying to figure out whether he has met

1    in person three children or four because he's talking about

2    boys, as opposed to age appropriate sex partners, and you have a

3    different number in your report for that.

4    A.   Right.   There were four males that he met with, three of

5    whom were minors.

6    Q.   Okay.

7    A.   And those were -- one of those is one of the John Does.   I

8    believe it's Number 4.

9    Q.   Okay.

10   A.   And there were two others that he revealed.   And then he

11   talked about a person who was over the age of 18 that he met

12   online.

13   Q.   Okay.

14   A.   And that was, I believe, through Craigslist.

15   Q.   All right.

16   A.   And he met with that individual for sexual exchanges and

17   that is not against the law, although there is an age difference

18   there.

19   Q.   A fairly significant one, wouldn't you agree?

20   A.   Pretty substantial, yes.

21   Q.   Fourteen years.

22   A.   Still it's not illegal.

23   Q.   I'm not suggesting that it is.   I'm asking why that would be

24   of any clinical significance to you, and you're saying it's

25   because there was a significant age difference.

Breeding - Cross

1    A.   I don't know that it's the age difference that's so much of

2    a factor as in that it's the similar behavior.  He met with

3    males that he actually met with that he met through the internet

4    in one way -- one capacity of the internet or another.  Whether

5    it was, you know, KIK, or Grindr, or Craigslist, or whatever,

6    that's still, you know, sort of a piece of the same behavior.

7    Q.   All right.  I'd like to talk to you now, please, about some

8    of your conclusions.  On page five, when you go through and

9    discuss the apparent nature and extent of sex offender

10   pathology --

11   A.   Yes.

12   Q.   -- and you talk about paraphilic disorders that are defined

13   in the DSM-V.

14   A.   That's right.

15   Q.   You go through a number of them to rule them out but then

16   you don't really go into another option that's available to

17   clinicians, which is other specified paraphilic disorders or

18   unspecified paraphilic disorders.

19   A.   Right.  They have to -- they have to meet the same kind of

20   criteria as listed in paraphilic disorders in the DSM-V.

21   Q.   Did you consider hebephilia?

22   A.   I did and so did the committee that devised the DSM-V.  They

23   discussed that long and hard, whether to include pedophilia.

24   There was a proposal to include pedohebephilia for a time there.

25   And the committee ended up deciding that -- based on the idea

1    that attraction to developed -- developing and developed

2    secondary sex characteristics, like pubic hair and body changes

3    and that, that was not a mental disorder because the attraction

4    is to the developed body.

5         And so what they did -- and this was something that's been

6    discussed on the internet forever.  There's a thing called

7    the Association For Treatment of Sexual Abusers of which I'm a

8    member.  There's a listserv, and all of us that are members of

9    ATSA around the world can talk to each other on that listserv.

10   And it was debated amongst the people on the listserv and there

11   were people voting for it and voting against it and so forth.

12   What the end conclusion was that they didn't consider it --

13   couldn't consider it a mental disorder to be attracted to

14   developed and developing bodies.

15   Q.  Even though that may lead to criminal behavior?

16   A.  Right.  It wasn't about --

17   Q.  Because it's against the law to have sex with somebody under

18   the age of 18?

19   A.  They're talking about a mental disorder rather than criminal

20   versus noncriminal.

21   Q.  I understand that, but doesn't the DSM-V -- and I'm looking

22   at page 685 -- say that eight listed disorders that you went

23   through do not exhaust the list of possible paraphilic

24   disorders?

25   A.  That's true.

1    Q.  Many dozens of distinct paraphilias have been identified and

2    named and almost any of them could by virtue of its negative

3    consequences for the individual or for others rise to the level

4    of a paraphilic disorder.

5    A.  Okay.

6    Q.  So sexual attraction to boys who are ages 13 to 17 can

7    certainly lead to these kind of difficulties.  If you substitute

8    pubescent child for prepubescent in the pedophilic disorder,

9    he's going to meet those factors, isn't he?

10   A.  Well, I guess you could argue that, although that's not

11   in -- that's not in their listing of -- so I went with what they

12   had listed.

13        MS. LAWLESS:  If I can have just one moment, Your

14   Honor.

15   BY MS. LAWLESS:

16   Q.  Mr. Breeding, we've already talked a little bit about David

17   Lee Groves and the assessment that you conducted with regard to

18   him.

19   A.  Okay.

20   Q.  Do you remember that one?

21   A.  I have it listed here.

22   Q.  Do you remember in that particular assessment talking about

23   exclusive hebephilia?

24   A.  Right.  That was --

25   Q.  If present is a basic sexual orientation and will in all

1   likelihood be refractoried to treatment, but you acknowledged in

2   that particular case just what I've asked you about today.

3   A.   Right.

4   Q.   And that that can be -- there is a paraphilic designation

5   for people who are sexually interested in children 13 to 17, 13

6   to 18 years old?

7   A.   Okay.  I stuck with what the DSM-V says because that's the

8   current -- you know, that's the current edition and the Groves

9   evaluation was well before the DSM -- that was back in the

10  DSM-IV days.

11  Q.   Would you agree with me though as a treatment provider that

12  something that you would take into consideration is that

13  there -- where you say there's no sex offender pathology

14  diagnosis appropriate for him and you're sticking straight to

15  this, even though the DMS-V allows you to take into

16  consideration things that aren't specifically listed, the fact

17  that he's sexually attracted to and sexually assaults and

18  produces videos with individuals who are legally and

19  psychologically unable to consent, isn't that a factor that

20  would be appropriate for mental health treatment?

21  A.   It is appropriate for mental health treatment very much.

22  Q.   Finally, with regard to some of your conclusions and the

23  recommendation with regard to further treatment --

24  A.   Right.

25  Q.   -- if you will, and your assessment, wouldn't you agree that

Breeding - Cross

```
1    while someone telling you about the things that they have
2    done -- and that's a good thing.  I mean, not to be cliche, but
3    apparently the first step is to admit that you have a problem
4    and to start looking for help.  You would agree with that,
5    wouldn't you?
6    A.  Yes.
7    Q.  But wouldn't you agree with me too that sometimes offenders
8    -- and it's possible that they would admit to sexual activity or
9    criminal conduct to halt an investigation?  I want to take
10   responsibility for this, and if I do, they won't necessarily
11   look for more.  There can be more than one reason for somebody
12   to tell you about the things they've done that are wrong.
13   A.  I suppose.  Now, I did not investigate that.  That could be
14   and that would be something that would have to come out later in
15   treatment.  And I recommended that he -- in my recommendation
16   where he would be housed in a facility that's got a sex offender
17   treatment program.  And I also talk about that he should be
18   reevaluated before he's released, you know, to see what's
19   current with him at that time and also use the then in-place
20   risk assessment instruments, which will be better tuned than
21   they are today.
22   Q.  Okay.  Is there any evidence, empirical, research-based or
23   otherwise that indicates that confessions that are made during a
24   presentencing interview at all present a lower risk for
25   re-offense?
```

1    A.   No.

2              MS. LAWLESS:  That's all I have, Your Honor.

3              THE COURT:  Redirect, Mr. Butler.

4              MR. BUTLER:  I do.  I have a little bit, Judge.

5        Your Honor, may I approach?

6              THE COURT:  You may.

7                       REDIRECT EXAMINATION

8    BY MR. BUTLER:

9    Q.   I'm handing you what I've marked as Defendant's Exhibit 1

10   through 3.  Ms. Lawless asked you some questions regarding the

11   peer review and validity of the Static 2000-R, the Static-99R,

12   as well as the Minnesota Sex Offender Screening Tool.

13   A.   Right.

14   Q.   I've presented you with abstracts from 2014 and 2015, one

15   regarding the Static and one regarding the Minnesota Screening

16   Tool.  Can you summarize for the court what the findings of

17   those publications were regarding the reliability of those tests

18   in predicting recidivism rates.

19   A.   Okay.  The Exhibit 2 refers to the Static 2002-R.  Their

20   findings -- basically, they say here that their findings further

21   support the Static 2002-R as a valid sex offender appraisal

22   instrument that encompasses multiple distinct clinically

23   relevant risk to means.  That's what they've got to say.

24   Q.   Can you tell us about the Minnesota screening tool.

25   A.   The Minnesota screening tool, they are referring in this to

Breeding - Redirect

1    the MnSOST-3, which is a revised -- revision of the revised

2    Minnesota Sex Offender Screening Tool, if you will.

3    Q.   Yes, sir.

4    A.   They found -- they start off saying that the MnSOST-R, the

5    original -- well, that's not the original because that's the

6    revised one that's been in place since the 1990s, one of the

7    most widely used sex offender risk assessment tools and then

8    they've got an update.  They added nine individual items.  Six

9    of those items are new.  They used a sample of 2,315 sex

10   offenders released from Minnesota prisons between 2003 and 2006,

11   and they were looking at predicting probabilities of

12   re-offending.

13       The results of their research indicate that the MnSOST-3 has

14   a relatively high level of predictive discrimination.  The

15   findings show that MnSOST-3 is well calibrated with actual

16   recidivism rates for all but the highest risk offenders.

17   Q.   So that's -- one's from 2014, one's from 2015 for the types

18   of tests that you administered.

19   A.   Right.

20   Q.   And, finally, I gave you --

21   A.   Exhibit 3.

22   Q.   -- a 2003 publication and that was sponsored by the United

23   States of America, as well as the Pennsylvania Department of

24   Probation and Parole, and it related to the Static-99-R, which

25   was the predecessor to the --

Breeding - Redirect

1    A.   That's true.

2    Q.   -- to the newer model?

3    A.   Yes.

4    Q.   And the conclusion of the United States of America, as well

5    as the Department of Probation and Parole in Pennsylvania was

6    that that was a reliable predictor of recidivism rates; correct?

7    A.   Correct.

8    Q.   And Ms. Lawless asked you with regard to -- you've testified

9    on behalf of defendants here in federal court?

10   A.   Yes.

11   Q.   Correct?  And you've testified on behalf of many government

12   agencies in state court as well as the probation -- or as well

13   as the parole board?

14   A.   Yes.

15   Q.   When you are -- I think it stands to reason, but when you're

16   retained as an expert by someone in the defense side --

17   A.   Right.

18   Q.   -- have there been occasions where you've provided opinions

19   to attorneys who have not particularly liked your opinion and

20   you did not end up in the witness stand talking to the court

21   about your opinions?

22   A.   I wasn't going to bring that up but, yes, I've done that

23   many times, found the person to be at high risk and I'll use the

24   actuarial instruments and provide the results to the attorney,

25   and he says thank you and that's the end of it.

Breeding - Recross

1    Q.  Were there any opinions formed in this case that you -- and

2    I in any way inhibited you from sharing with this court?

3    A.  Absolutely not.

4              MR. BUTLER:  Thank you, Your Honor.

5              MS. LAWLESS:  One quick Your Honor.

6                        RECROSS-EXAMINATION

7    BY MS. LAWLESS:

8    Q.  Mr. Breeding, would you agree with me that in order to

9    accurately track recidivism rates --

10   A.  Right.

11   Q.  -- that it's totally dependent upon someone being caught?

12   A.  That is exactly right.

13             MS. LAWLESS:  Thank you.

14             MR. BUTLER:  Your Honor, I'd simply move for the

15   admission of Defendant's 1 through 3, sir.

16             THE COURT:  All right.  Did you hear that,

17   Ms. Lawless?

18             MS. LAWLESS:  Yes, sir.

19             THE COURT:  Any objection?

20             MS. LAWLESS:  I have no objection.

21             THE COURT:  They'll be admitted.

22             (Defendant Exhibits 1, 2 and 3 admitted in evidence.)

23             THE COURT:  Any further testimony, Mr. Butler?

24             MR. BUTLER:  No, Your Honor, no further testimony.

25             THE COURT:  All right, sir.  You may step down, sir.

1       All right.  In addition to calculating the sentencing

2   guidelines, which we discussed earlier, I must also consider the

3   relevant factors that have been prescribed by Congress in 18

4   U.S.C. Section 3553 and in so doing ensure that I impose a

5   sentence that is sufficient but not greater than necessary to

6   comply with the purposes of sentencing.

7       These purposes include the need to sentence -- for a

8   sentence to reflect the seriousness of the crimes charged and

9   for which the defendant has been found guilty or has pleaded

10  guilty, to promote respect for the law, and to provide just

11  punishment for the offenses.  Any sentence should also deter

12  criminal conduct, protect the public from future crime by the

13  defendant and promote rehabilitation.

14      In addition to the guidelines and the policy statements, I

15  must also consider the nature and circumstances of the offenses,

16  the history and characteristics of the defendant, the need to

17  avoid unwanted sentencing disparities among similarly situated

18  defendants and the types of sentences available.

19      That is in essence what is required under 18 U.S.C. Section

20  3553.  Those are factors that the counsel here are very familiar

21  with so we need now to talk about those.  Ms. Lawless, do you

22  wish to present any argument about the application of the 3553

23  factors?  Do you have any position with respect to a variance?

24          MS. LAWLESS:  I do, Your Honor, and I assume we're

25  going to hear from the victims after this part.  Is that

1    correct?

2              THE COURT:  We will, yes.

3              MS. LAWLESS:  Thank you.

4       Your Honor, I will not -- I filed, as you know, a 25-page

5    sentencing memorandum in this case, and I'm not going to go back

6    through and beat all of that over again.  I do want to touch on

7    the sentencing factors from our perspective but I also would

8    like to respond -- and I think I'll do that first, if that's

9    okay with you -- with what I saw being proposed to the court on

10   behalf of the defense as it relates to the types of sentences

11   that are available in a comparison that was being offered to the

12   court for consideration with regard to similarly-situated

13   defendants in this district.

14      The cases that were cited by the defense to you, Mr. Elbe,

15   4:12-CR-18, that was not a production charge, Your Honor.  That

16   was an advertising charge so there was no production of child

17   pornography images.  And in that particular case, Judge McKinley

18   imposed the 15-year mandatory minimum but there were no images

19   that were produced by Mr. Elbe.

20      With regard to the *Elliott* case, 3:10-CR-128, that also was

21   a 180-month sentence.  In that particular case there was one

22   victim.  I'm familiar with it because it was my case.  Judge

23   Simpson followed our recommended sentence, which was a (C) plea.

24   It reduced the guideline range from 260 months to 180 months in

25   part because Mr. Elliott cooperated with the United States.  And

1    I'm not speaking out of school on this particular topic because

2    he actually came to court and testified in a case that a

3    colleague of mine, Mr. Judd, was prosecuting.  And so for that

4    cooperation, a single victim who had indicated to the United

5    States that she wanted to move on, we came upon that (C) plea

6    agreement.

7        The *Hart* case, 3:08-CR-109, in that particular case Judge

8    Coffman also imposed a 180-month sentence because it was a sting

9    operation.  This was somebody who had been talking with an

10   online undercover detective and was talking about making child

11   pornography.  No images were actually created.  When he showed

12   up to meet that child, he was arrested and was charged with the

13   enticement and also with the attempted production.

14       In the *Cauley* case, 4:08-CR-6, there was a 240-month

15   sentence that was imposed in that for two counts of production

16   that involved one victim.

17       In the *Garrett* case, 3:13-CR-26-R, that was a (C) plea in

18   front of Judge Russell for 270 months, which was reduced from a

19   360-month sentence.  There was one victim for production.  There

20   were also some related state charges.  And, again, that

21   resolution was reached in part at the urging of the victim, who

22   wanted to move on.

23       The *Lewis* case, 5:14-CR-6-R, was a 300-month sentence

24   imposed by Judge Russell that also was a (C) plea the parties

25   had agreed upon.  It was a slight reduction from the sentencing

1     guidelines recommended and it was one victim who was

2     extraordinarily in a vulnerable position, and with coordination

3     with the family, that 300-month sentence was agreed upon.

4         And, finally, the last one referenced by the defense,

5     *Middleton*, 3:13-CR-118-R, Judge Russell imposed a 324-month

6     sentence in that case but that was the recommended -- within the

7     recommended guideline range.

8         The United States, as you know, offered to the court a

9     recommendation.  It is a variance from the recommended life

10    sentence, but in all honesty, it is in effect what would be a

11    life sentence.  We are recommending to the court imposition of a

12    120-year sentence.  That is not unprecedented in this district,

13    Your Honor.  In the *Tony Davis* case, Judge McKinley just a few

14    years ago in fact imposed a 120-year sentence in a case that

15    involved three victims, but they admittedly were much younger

16    than the children that are involved in this particular case.

17        I didn't just pick a number out of the air.  I hope the

18    court knows that I take these cases very, very seriously.  I

19    looked back at the cases that I have prosecuted over the course

20    of the last 14 years of my career and compared that conduct as

21    best as I could with the cases that I have handled.

22        In our sentencing memorandum, when I suggested to the court

23    that it's somewhat difficult to try and bring to the court a

24    meaningful argument with regard to parity or to avoid sentencing

25    disparity, it's difficult to do in this case because Mr. Newman

1    is peerless.  We have not had any other defendant that we have

2    prosecuted in this district that involved so many different

3    children, 16 different victims.

4        The approach that I took with regard to that, Your Honor,

5    was looking at what the statutory mandatory minimum for each

6    production count is.  If you give him credit, which he should

7    get some credit for being cooperative, and he should get some

8    credit for pleading guilty because he has saved further harm to

9    those children that would be required to come in and testify if

10   the matter had gone to trial.  So in taking that into account, I

11   looked at it and tried to have an analytical approach.  And if

12   we took 16 different victims and you give him credit for being

13   cooperative and not going to trial and not putting them through

14   the trauma of trial testimony and you cut it in half, which is

15   being extraordinarily generous, and you take it -- that would be

16   a seven-year sentence.  If you multiply that out for each

17   victim, that is 120 years.

18       When I look at other cases that I have been involved in in

19   prosecuting that involve production of child pornography,

20   Mr. Glover, Judge Coffman sentenced to 70 years in prisons.  He

21   was a younger man, just like Mr. Newman, with a single victim.

22   In her determination, she felt like once he reached his 90s that

23   he would no longer pose a threat.  We had a long discussion

24   about that.  That was her decision and we respected that, but

25   that was a very significant sentence.

1      As I mentioned, that was not my case with Judge McKinley,

2  Mr. Davis, but that involved three victims and the judge imposed

3  a sentence of 120 years.

4      Mr. Bracket was in his 20s when Judge McKinley sentenced him

5  and he had been a youthful offender.  He imposed a 40-year

6  sentence for a single victim production.

7      Mr. Monk was prosecuted by me a year or so ago.  He had a

8  17-year-old -- it was his stepdaughter victim.  She was

9  compliant but it was a single victim, and there was no evidence

10  of distributing those images that he created, the sex tape,

11  beyond him keeping it for his personal enjoyment, but he took it

12  across state lines and that was a 20-year sentence.

13      Mr. Black had an attempted production charge.  He went to

14  trial.  He traveled to Ohio thinking he was going to meet a

15  victim.  For him it ended up being a chief of a small police

16  department and he received a 30-year sentence.

17      Mr. Hawkins was a 60-year sentence.  There were two victims

18  that were involved.  That's a Bowling Green case for Judge

19  McKinley.  The children were all asleep when the images were

20  produced.

21      And then Mr. Hart, there's a 15-year sentence because,

22  again, it was an attempted production that involved an

23  undercover during an online sting.

24      So we believe with regard to the argument that was presented

25  to the court on behalf of the defendant that a 15-year sentence

is appropriate based on what other people may have received in

other production cases, we vehemently disagree with that.  The

only time a producer of child pornography has ever received the

statutorily mandated minimum sentence was when there was no

child involved, no images were created because it was a sting

operation.

With regard to the 3553(a) factors, Your Honor, I mentioned

a moment ago that Mr. Newman is peerless and he is in many

respects, the sheer number of victims involved but also the

sentencing guidelines calculations.  You I'm sure noted in the

presentence report the advisory note that is available in the

very unusual -- I think that's the language of the guideline

manual -- in unusual circumstances when the offense level is

higher than a 43 or lower than a I, the court's directed to

consider it a 43 or a I.

I think that it is important that we not forget Mr. Newman

wasn't being moved from a 44 to a 43, and maybe it's one of

those things that once you're past 43, what difference does it

make?  But I think it makes a difference in this case because he

was in the 50s.  That is unprecedented.

With regard to the fact that there were so many victims, the

enticement that went on, the types of images that were being

created and meeting children in person to produce them and not

just that but then taking a video that was produced with a

15-year old child and using it going forward and communicating

1   with other people, not just adults that he was distributing to

2   -- and we have provided that information in the presentence

3   report about the number of people with whom Mr. Newman was

4   trading -- but he used videos that he created with a 15-year-old

5   child in order to convince and groom other children online.

6       Those enhancements that take him into the 50s really are

7   unprecedented.  They are unusual.  And the guidelines, I respect

8   them.  I think there's a great deal of value in them.  I always

9   have and respect the fact that you're limited a 43, but we

10  strongly urge you to not lose sight of the fact that it is

11  there, not from a one- or two-level move to a 43 but from the

12  50s down to a 43.

13      You are familiar, I know, with the facts and circumstances

14  of this case with regard to the number of victims.  You, I

15  believe, have read the sentencing memoranda.  You had an

16  opportunity to read -- review the chats.  Defense counsel

17  brought out on cross with Special Agent Hutchinson -- and it's

18  something that the United States recognizes and we're not trying

19  to misrepresent to the court.  Mr. Newman was not driving down

20  the street in a panel van grabbing children off the street.

21  That's not the kind of offender that he was.  His victims were

22  compliant.  He did not have to abduct them.  He did not have to

23  beat them or restrain them or things of that nature.

24      However, they were in their own right, Your Honor,

25  vulnerable in a different way.  They are 13 -- or, actually, one

1    was 12 -- 12- to 17-year-old boys.  We ask the court to consider

2    some online references and there's a tremendous amount of

3    material that's available that talks about brain development and

4    that the human brain we now know with the advent of recent

5    modern technology, namely MRIs, isn't really fully formed until

6    about the age of 25.  So maybe what the car rental companies

7    have known for a while, that they don't want to rent to people

8    under that age, we're kind of catching up with.

9        These are people whose brains are not fully developed.

10   Importantly, that prefrontal cortex that helps with good

11   decision-making, risk assessment, and all the things that help

12   you make good choices isn't fully developed for these boys.

13       They are all, I think it is a fair assessment to say from

14   reading their chats, going through puberty or just after it.

15   Their bodies are changing and there is an awakening that goes on

16   in all of us about our sexuality.

17       We may have as a country made significant strides forward

18   with regard to recognizing sexual preferences, sexual

19   identities, and recognizing rights for people who are not

20   heterosexuals.  I would submit to you that when you are 13 or 14

21   or 15 or 16 or 12 or 17 and all of this is going on, you are

22   trying to figure that out.  They were in vulnerable points in

23   their lives.

24       They are doing what, unfortunately, so many children around

25   the world and in this country do.  They don't really talk to

1    their friends face-to-face anymore.  They're not going to the

2    school counsellor.  They're not talking to their moms and dads.

3    They go to what they know and they are a technology generation.

4    They are going online and they are looking for answers to the

5    questions that they have about their own bodies and about the

6    things that are going on in their lives.

7        And when they get there, they meet a man who is friendly to

8    them, that represents himself to be a teacher, who talks to them

9    about the things that they're interested in, who validates the

10   questions and things that are going on in their lives.  And he

11   knows about that, Your Honor, because he struggled through those

12   things, as we know from the report that Mr. Breeding prepared,

13   himself during those ages all those questions.  But he also has

14   been teaching and coaching in an environment that made it very

15   well aware to him the development of young boys and how to get

16   them to do -- good coaches know how to get 13-year-old boys --

17   how to all get on the same page and play football and execute

18   plays and 14 and 15 and 16 and 17.  That's a great thing unless

19   he's using that knowledge and experience for illegal and hurtful

20   and harmful purposes, which is what he did in this case.

21       Mr. Newman is a well-educated, intelligent, articulate,

22   charming person.  He's very lucky.  I know that sounds a little

23   bit crazy in light of the position that he's in today, but he is

24   a lucky man in the sense that he has a lot of people who love

25   and care about him and provide a significant supportive network

1    for him.  And I know that part of your responsibility is to look

2    at that.  And you have to look at him as an individual, his

3    background, his history, his characteristics, all of those

4    things.

5        Please know that that was not ignored by the United States.

6    We recognize that.  We appreciate the fact that he was

7    cooperative and helpful to us in our ongoing efforts.  But at

8    the end of the day, he has irreparably, irreparably harmed so

9    many young boys and their families.  And part of the criminal

10   justice system, as you know, is to punish him for that and to

11   try and protect future harm being committed by him.

12       For all of those reasons, as well as the additional

13   information that is set out in your sentencing memorandum, we

14   respectfully request that you consider imposing a 120-year

15   sentence followed by a life term of supervised release in this

16   case.

17            THE COURT:  All right.  Thank you, Ms. Lawless.

18       Mr. Butler.

19            MR. BUTLER:  Thank you, Your Honor.  Your Honor, when

20   I first read the Government's memorandum, I saw that 120 years

21   they asked for.  You know, it makes you start thinking.  I'm a

22   history buff.  I don't know about you.  A hundred and twenty

23   years ago, if we go back, people were in horse and buggies.

24   Teddy Roosevelt was not president of the United States yet.

25   There was no airplane.  There was no cars.  There was no radio.

1    There was no TV.  We were 30 years from the end of the U.S.

2    Civil War.  That is an astronomical amount of time to ask for

3    someone.

4        I mention that because we as attorneys, whether defense

5    attorneys or prosecutors or agents, we negotiate these cases and

6    we throw these numbers around like it's a betting line in a ball

7    game.  That's real time to stand up and -- I mean no disrespect

8    to Ms. Lawless -- to stand up and give the court some

9    explanation about how somehow she's doing him a favor by arguing

10   for 120 years and then lifetime on supervised release.  Unless

11   he's Father Abraham, it doesn't matter about supervised release

12   and 120 years is a death sentence.  So I think we have to look

13   at everything and because ultimately, as this court knows, you

14   have a hard job, which is to render a fair sentence applying

15   these statutory factors.

16       Ms. Lawless started with the guidelines so I'd like to talk

17   a little bit about the guidelines.  Mr. Newman received a

18   four-level increase for sadistic or masochistic conduct.  When I

19   pulled from the federal defender's website, as this court's very

20   well -- 2011 is the one I looked at -- most people get that.

21   That's not something that necessarily distinguishes him from

22   anyone else.

23       Mr. Newman -- and it applies -- Mr. Newman got a two-level

24   increase because he used a computer.  I seriously doubt anybody

25   in this courtroom has ever seen a child pornography case in the

last ten, 15 years that didn't involve a computer.  I certainly

can say as an officer of the court I've never seen one.  I've

read about them in law books in law school, but that is an

enhancement without a distinction.  Almost everyone gets that.

Mr. Newman got two five-level increases.  One five-level

increase was for grouping.  That's because there were multiple

victims involved in the case.  So he got a five-level bump

because those were grouped.  He also got a five-level bump for

pattern of activity, which is something happening on more than

one occasion.  All of those enhancements don't really

distinguish him from anyone else.  Sure, he -- does he deserve

five levels for having more than one victim?  The guidelines say

yes and he probably does deserve an increase.  Does he deserve

ten when it's punishing the same harm?  Of course not.

When you take those out of the equation, when you take that

49, after the acceptance of responsibility, and you remove the

sadistic or masochistic conduct, which nearly everybody's going

to get for this, you remove the computer enhancement and you

give him the five levels for multiple victims, but you don't

punish him twice by giving him another five levels for a pattern

of activity -- if you have multiple victims, you got to have a

pattern of activity -- you go down to 235 months to 293 months.

So when we talk about the guidelines and how appropriate

these guidelines are, I mean, we all just have to take a step

back and look ten years ago.  These same guidelines were putting

people in prison for 5 grams of crack cocaine for a mandatory

minimum of five years on a first-time offense.  And we've all

taken a step back and looked at them and gone, from Congress, to

the Sentencing Commission, to the Department of Justice, this is

unconscionable.  We can't do this and that's where we are with

these child pornography guidelines.

No one likes this.  No one can stand here and say that this

is a good thing, and he certainly isn't and I'm certainly not

going to, but these guidelines with these enhancements, they're

punishing conduct more than one time.  So when we look at these

guidelines, yes, they're high.  Yes, he's going to -- he knows

he's going to get a significant sentence from this court.  But

to get it to life, we have to look at it we're double counting a

lot of conduct here that shouldn't be double counted.

When we also look at these 3553 factors, as I laid out, the

reason we just don't put the grid on -- sentence based on a grid

anymore is because the U.S. Supreme Court has said, hey, look,

we have to look at these people individually and look and

balance everything.

So Patrick did harm here, there's no question, but there's

also a lot of good things he did in his life.  Anybody that has

opportunity can be educated.  That's great.  He has an

opportunity to go forward if this court allows him to get out

and do something with his education, sure, but here's a person

that taught.  He taught at Our Lady of Lourdes.  He taught for a

 1   long time there.  He taught at Trinity.  There are no victims

 2   from Our Lady of Lourdes.  There are no victims from Trinity

 3   High School.

 4        You got the letters from people in the community.  There's

 5   lots of people in the community here today that are connected

 6   with that parish and that high school, and there are a lot of

 7   people's lives that are better today because of Patrick Newman.

 8   And I recognize there are people's lives that are worse today.

 9   There's no question.  That's why we're here.  But there are a

10   lot of people's lives that are better because of him.

11        You know, one of the things that -- one of the letters

12   specifically that I sent to the court was from Andrew Coverdale,

13   who is a teacher at Trinity.  He's not writing on behalf of

14   Trinity High School.  He's writing on behalf of someone that

15   works side by side with Patrick.

16        But the thing I thought that was most telling is what he put

17   in the email from what he received from one of the parents of

18   one of the students that Patrick interacted with of how he

19   helped that student so well.  The backstory is that student has

20   gone on to get in a great school and had some troubles and he

21   helped.  He didn't molest this kid.  He didn't mistreat him.  He

22   helped this kid move forward, and there's countless stories

23   about what he did.

24        Not only was he a teacher, I mean, where he helped people,

25   but he was a football coach at Trinity High School.  As this

1    court's well aware, that's one of the most successful programs

2    in the country.  Does that excuse what he did?  Of course not.

3    But he had a positive impact on countless football players and

4    some of them are here.  Those are things that that's why we have

5    3553.  Those things have to weigh to whatever extent you believe

6    they should against the wrongs that have been done, but that's

7    why it's in there.

8        In a case like this, you would anticipate or I would

9    anticipate -- I can't speak for the court -- that you would have

10   mom and brother, maybe brother's wife, sitting on the front row

11   because we all love our family, right, wrong, or indifferent.

12       What I asked Patrick's mom to do when she requested letters

13   to you, I said, "Beth, would you please let everyone know

14   exactly what Patrick did."  And does that make it all right that

15   these people are here?  Of course not, but you have multiple

16   members of the community, God-fearing, church-going,

17   contributing members of society, lawyers, prosecutors, people

18   that know Patrick from the time he was little.

19       What they attest to, of course, is how shocked they were,

20   how disappointed they were.  But, also, they attest to the good

21   that they saw and many of them have continued to stay in touch

22   with Patrick while this has happened.  A lot of these people

23   have gone to visit him.  And what they all said and you read

24   them is how committed he is to getting help and moving forward.

25   Again, that doesn't make it right.  It doesn't excuse his

conduct, but when you have this many people that know you and know what you did who are willing to put pen to paper, name to letter on an offense like this and to show up here for him to say, hey -- not it's okay, Judge.  None of these people have said this is okay.  None of these said -- these people said this is no big deal.  They all said it was very serious, but they all universally -- and I guess that's the theme of everything I hope to accomplish here in this argument today -- it's a life worth saving.

Does he deserve punishment?  Yes.  Is he going to get it?  Yes.  But is he the person we just need to discard and say you'll never see the light of day?  Is he the person that we need to give 120 years to, and if he lives 120 years, then the taxpayers can pay millions upon millions upon millions of dollars to warehouse him.

These people that know him, from Father Miller, his priest, to Andrew, to his brother Clay, to all these other people that have -- he has touched their lives all have universally said, "I think there's something that can be saved here."  I think that's important.  I think that's what 3553 -- that's why we look at people individually.

The cooperation with law enforcement, again, that's -- I think that's something that -- does it excuse what he did?  Of course not.  Is that important, the fact that when they came to his house, rather than say I want a lawyer, he said, I'll answer

1    your questions.  You can have my passwords.  Here's how I got

2    on.  Here's who I chatted with.  Here are the names and the ages

3    to the best of my knowledge of people I was chatting with.

4        I think it's important that three days after that event,

5    when he meets the lawyer and his lawyer says one of these days,

6    you know, we're going to be deciding whether to go to trial or

7    we're either going to be deciding whether to plead guilty and

8    we're going to be addressing a jury or a court, he says,

9    I did it.  I don't want to -- I don't need to see a jury.  I'm

10   responsible for this.  I want to take responsibility and I want

11   to talk to the Government, that's important.  Does it excuse it?

12   Of course not, but those are things -- that's why we have 3553.

13       I think it's important that we asked for a third -- or a

14   second meeting specifically for the purpose of him sitting down

15   and looking the agent and the federal prosecutor in the face and

16   saying, "Yes, I had sexual contact."  You know, we agreed not to

17   talk about it the first time.  I told Ms. Lawless.  We agreed

18   not to discuss the subject, but we came back specifically for

19   that purpose.  Here's who I had contact with, the best of my

20   memory.  Here's how you might be able to identify them.  Again,

21   those are things that should factor into what's fair here.

22       I think when you look at -- you take his willingness to

23   admit his wrongdoing, his willingness to go forward and consent

24   to searches, to knowing that they were going to find bad

25   information, he knew it.  He told them it was there and he

1    helped them.  When you take that and you couple with the success

2    that he's had -- and I mean that by strong education, strong

3    academics, great teacher at Lourdes, great teacher at Trinity,

4    great football coach, this is a person that's capable of being

5    successful.

6        So when you -- we'll get in a little bit to when we talk

7    about recidivism, but when you assess a person as a court, in my

8    humble opinion, you have to look and say is this the person

9    that's likely to come back before me and re-offend or is this a

10   person that I can think they may be able to make it?

11       One of the things, of course, you look at is if they have a

12   criminal history.  If you've been to court ten times, there's a

13   good chance you're going to be here 11 times.  If you've never

14   been to court, there's less a chance you're coming back.  But

15   people who are successful and proven that they're successful, I

16   believe, are much more likely to be able to move forward from

17   this and overcome the issues that got him here, to seek the

18   treatment and to be committed not to coming back.  And I think

19   his cooperation with law enforcement reinforces that.

20       The other thing that I think is incredibly important and

21   ultimately what you think's important is what's important, but

22   we talk -- I put cases in my sentencing memorandum.  Ms. Lawless

23   addressed other cases.  What Patrick did was morally,

24   religiously, and legally wrong and I'm not minimizing it.  All

25   of these people are victims because they were underage, but

1    there is in my mind a distinct and a major difference between

2    what happened here and what often happens with sexual conduct

3    crimes.

4         In this case these teenagers were on these applications and

5    Ms. Lawless is right.  They're young.  She's right.  He should

6    have known better, but every one of them was on these

7    applications.  It is disingenuous to argue that he somehow made

8    them do something that they weren't already out there on.

9         As the agent told you and as -- you can read the texts, when

10   these people were seeking these types of things out, he was the

11   man.  He's the adult.  He should have said no and he is going to

12   pay and has paid dearly for that crime, but that in my mind is

13   very different from the case -- for example, Mr. Middleton's

14   case that Ms. Lawless referred to.  Mr. Middleton, aside from

15   producing child pornography, repeatedly raped a four- or five-

16   year-old and that didn't happen here.

17        These aren't -- as Ms. Lawless correctly pointed out, these

18   aren't pulling people off the playground.  You know, as I

19   reflected on this -- my son's -- he's nine.  He likes to play

20   baseball.  He plays out at Saint Matthews.  As horrible as this

21   would be, if someone asked -- motioned him into the bathroom and

22   raped him, he would go to state court, that person.  This awful

23   thing, grab him, take him to a stall, the most egregious thing I

24   can think of that could ever happen in my life.  He would face

25   20 to 50 years or life and he would be eligible for parole, no

1    matter what that court gave him, in 20 years.  That is the

2    most -- as all of us that are parents, that is the most horrific

3    thing any of us can imagine, a perfectly innocent child who did

4    nothing wrong, in the most innocent activity, and that's how

5    society would punish that person.  And that person would have an

6    opportunity in 20 years, no matter what the court said, to

7    appeal to a parole board and say, "I'm changed."

8        But in this case, our victims, while they're still victims,

9    they're out there seeking this type of conduct out.  And, again,

10   I'm not blaming them.  They all, I'm certain, are having issues

11   and I agree with Ms. Lawless, they're all dealing with their

12   homosexuality.  They're dealing with their sexuality.  And

13   they're not mature adults and that's why this is a crime, but to

14   equate what Mr. Middleton did with a four or five-year-old or to

15   equate what some of these other people I list in my brief did

16   where they were molesting their eight- and nine-year-old

17   daughter repeatedly, it's just not the same.  It doesn't mean he

18   doesn't deserve punishment.  He certainly does but it is a

19   distinction with a major difference.

20       It's also important to note, when you try to factor in

21   child -- you know, the sentencing range, Congress has said 15

22   years is the minimum.  Life is the maximum for child production.

23   So we try to look at -- in my mind, what Mr. Newman did versus

24   other conduct that could be punished under this.  In this case,

25   as we talked about, these were -- as Ms. Lawless said, there was

1   no coercion.  These were willing victims.

2       Under that statute, 15 to life, it would punish unwilling

3   and coercion or children that were so young that they couldn't

4   possibly have any say in this.  There was no force used here.

5   It doesn't make what he did right, but he didn't make anybody do

6   anything.

7       There's no grooming here and that's important because in

8   this particular case this isn't the classic case of -- you know,

9   we'll use his profession as a teacher.  He's in the classroom

10  every day.  He can make advances.  He can make sly jokes.  He

11  can try to put himself alone with a kid and something happens.

12  That didn't happen here.  All of these people are out on the

13  internet already.  There's not a grooming process.  Right, wrong

14  or indifferent, they're out there for this type of process.  He

15  should have said no, but they're out there.  Everything was

16  consensual.

17      So when we look from that 15 to life where Congress is

18  saying, Judge, you can sentence someone as low as 15 or as much

19  as life, we got to factor in that in that range is consensual

20  and nonconsensual.  All of his is consensual.  That's got to go

21  toward the low end of the range.

22      When we talk about production of child pornography, I mean,

23  sure, this meets the definition.  He's produced child

24  pornography.  He's asked teenage boys to commit sex acts and

25  send them to him.  That's production.  No question he pled

guilty to it.  But what we really think about production of

child pornography, the people that are out there producing this

mass quantity for consumption and profit, that's not him.  Does

that mean he doesn't -- shouldn't be punished?  Of course not.

But when we look at the range from 15 to life and we try to

figure out where Congress had somebody like him in mind, we have

to think, gosh, there are people out there like the Russian

mafia that are producing this stuff massively, that they're

kidnapping children, they're keeping them hostage, and they're

making them do this with force, threat, drugs, whatever, and

they're making millions of dollars on it.  That's not him.  So

somewhere in that continuum from 15 to life we have to factor

that in.

Along the same lines, one of the hot topics of DOJ in the

media now is human trafficking because people are taking young

children and they're forcing them in to being sex slaves and

they're forcing them into making these videos.  That's somewhere

on this continuum too, somewhere between 15 and life.

There's no human trafficking here.  There's no him

kidnapping kids.  There's no him making kids do something.  It

doesn't excuse what he did.  Obviously, what he did Congress has

said is very serious and deserves a very, very serious

punishment, but they've given the court a broad range.  And when

we look at this globally, we have to say, what other factors are

out there that you could see that are absent in his case?

1      The other is -- and I touched on it, but as Ms. Lawless

2   said, 12 to 17 years old.  That's a crime and no question, but

3   in that 12- to 17-year range or that 15-to-life range, we have

4   to figure that there are perverted people out there producing

5   child pornography involving babies, involving -- in this one I

6   cited, Mr. Middleton, involving four- and five-year-olds.  Make

7   what he did right?  Of course not, but Congress said 15 to life.

8   And the victim ages in this have to move us closer to the low

9   end, not the high end.

10      So when we analyze his crimes and we think about others that

11   could be here and other things that could happen, and we take

12   into context all of the deviance that people can do under this

13   production of child pornography, many of those aggravating,

14   horrible factors that we -- that you may see in the courtroom,

15   we certainly see on the news, they're just not here.  They're

16   just not here.

17      I mean, we look at -- probably the most highly publicized

18   case in the United States recently was Mr. Fogle, the Subway

19   spokesperson.  Here was a multimillionaire that was literally

20   running an operation, was paying people to go find young girls

21   to engage in sex acts and commit -- and to do these videos that

22   was having sex and was traveling all over to have sex with

23   minors.  The court sentenced him to 15 years and eight months.

24      Now, he did not have a production charge, but everything

25   that we could find offensive, a rich person seeking out very

young people, paying people to find victims, paying people to

find victims and then having sex and traveling to have sex with

them, does it really warrant the difference in 15 years and

eight months to this astronomical sentence because there's a

picture of it?  At the end of the day, the hard thing you have

is to reach a fair verdict.

One of the things that I put in here that I think is

important -- and I don't -- if we stopped the average person on

the street and we said, let me tell you all the stuff that

Patrick did, they would be upset.  They would be angry.  They

would think he needed to be punished, but I suspect that the

thing that would bother them the most would be that he had

sexual relations with someone under the age of 18, that he had

sexual relations with a 15-year-old and John Doe whatever.

While federal court is very different than state court, I

think it's important -- just for fairness, if we take out the

context of trading the pictures over the internet or taking the

pictures, if we look at the thing that would most offend the

average citizen, the fact that this man who knew better violated

his faith, violated the law and had sex, that's called statutory

rape in Kentucky, 15-year-old.  It carries a penalty of one to

five years.  He would be eligible for probation.  He would be

eligible for shock probation, and if the court didn't see fit to

shock probate him or probate him, he would be eligible for

parole, if he got the maximum sentence, in one year.

1    And that is the thing I suspect that most offends anyone

2  about what Patrick did.  I'm not minimizing what he did.  I'm

3  not even saying that that sentence should be higher, that we

4  shouldn't change the state laws, but when you put it in

5  perspective, because he's here, because it happened over a phone

6  that somehow it goes from that to these astronomical -- somehow

7  it goes from that to before Teddy Roosevelt was president.  That

8  doesn't seem fair.

9    One of the other things that you have to consider is the

10 deterrent value, both general and specific deterrence.  And I

11 can't think of any sentence that you could give under the law

12 that wouldn't provide for general deterrence.  I can't imagine

13 anybody that heard that the court gave 15 or 20, or whatever,

14 knowing that there's no parole, there's no probation, you don't

15 get out, you serve your time, that that doesn't send a message,

16 assuming any of this ever sends a message to anybody.  I'm not

17 sure I believe that, but if one does and it believes that a

18 sentence somehow affects someone else's conduct, these are

19 draconian sentences that Congress has set up, no matter what you

20 give him.

21    Specific deterrence?  His life is altered beyond repair.

22 Even if we skip your sentence, which is the most important thing

23 in his life at this point, but even if we forget that, highly

24 esteemed member of the community.  That's ruined.  Publicly

25 humiliated.  He caused it but that happened.  Great job that he

1    worked his whole life to get, gone.  Coach that he worked his

2    whole life, gone.

3        He'll never see a Trinity High School football game no

4    matter what you do for years.  He'll certainly never be on the

5    sideline of any high school football.  So everything that he

6    worked for is gone.

7        He has caused untold pain to -- I don't know -- 50, 100

8    people here today.  They love him but he's changed in their

9    eyes.  All these things, when you look at specific deterrence,

10   aside from your sentence, nothing we can do here is ever going

11   to fix that.  He's done that to himself, but we can't pretend

12   that these collateral consequences didn't happen and that they

13   shouldn't be considered in the 3553 factors.

14       Finally, I think the court has to look at is he likely to be

15   successful on supervised release, whenever that day comes, if

16   the court sees fit to give him that opportunity?  As I said, his

17   past success I think bodes well for success.  His confessions

18   and his cooperation bode well for success.

19       The reason I had Dr. Breeding conduct those -- those aren't

20   his opinion.  The reason I had him do these tests is where does

21   he fall on those?  He falls in the low to moderate risk on one

22   and the low risk to re-offend on two.  Is it a crystal ball?  Of

23   course not.  We can all do anything we want tomorrow.

24       What it is and what those studies I gave you are, including

25   one from the Department of Justice, is it's a reliable

1    indicator.  It's not perfect.  It's not a crystal ball, but it's

2    a reliable indicator and it's something else that goes in the

3    mix here when the court considers is this someone, once he's

4    released, whatever sentence you ultimately sentence him to, is

5    he likely to be successful on supervised release?  And I think

6    when you take those three primary components together, the

7    conclusion should be, yes, he's likely to be successful,

8    certainly likely to be successful with the types of restrictions

9    that are going to be placed on him by U.S. Probation.

10       So we come down to this, Judge.  He deserves punishment and

11   he knows it, and he's going to tell you that and he knows it's

12   going to be a significant punishment.  But when we look at all

13   these factors, we look at the total picture, everything he did

14   wrong, everything he did right, how he handled himself after

15   this happened, the ultimate question comes down is is his life

16   forfeited and we're going to warehouse him forever or is there

17   something in his life prior to this, something in his life while

18   this is going on and all the good he did, doesn't that balance

19   it out to give him a chance?  I'm not asking you not to punish

20   him.  I'm not asking you to not punish him significantly.  But I

21   believe all of this weighs heavily in the favor that he does

22   deserve a chance at life.

23       We've asked you to impose the mandatory minimum.

24   Respectfully, we would ask the court to weigh all of this,

25   consider this spectrum of what could fall between this 15 and

1    life and the types of things and the types of conduct that could

2    come in here.  And I believe if you do all that, Your Honor,

3    respectfully, he would be sentenced more toward the low end of

4    the statutory range than the high end.  Thank you, sir.

5            THE COURT:  Thank you, Mr. Butler.

6            MS. LAWLESS:  Your Honor, I would like to address some

7    of the arguments that were made beginning -- I'm going to go

8    back to the beginning, particularly with regard to application

9    of the sentencing guidelines.

10       First of all, with regard to the enhancement that was

11   applied -- and I would just note, Judge, that there were no

12   objections filed to the calculations.  We've already addressed

13   this.

14           THE COURT:  I don't want to interrupt your argument,

15   but to the extent that you feel the need to argue the guidelines

16   points that Mr. Butler made, it's really -- for that last point

17   you made, because the guidelines are not really subject to any

18   further discussion at this point, they are what they are.  There

19   are no objections.  I haven't had to rule on any objections so

20   we all agree what they are.  It's probably not necessary for you

21   to go through that.

22           MS. LAWLESS:  All right.  Thank you.  I'll skip that

23   part and move forward then.

24       There are a couple of other points that I would like to

25   make, however.  The comparison to recent statutory or

1   legislative action and modifications of the United States

2   Sentencing Guidelines with regard to drug offenses, specifically

3   crack cocaine, and comparing it to child pornography befuddles

4   me almost beyond words, but because I'm a trial lawyer, I have

5   found some for you.

6       The way that I think that you can most easily does

7   distinguish between those two kinds of crimes -- and as you

8   know, Your Honor, I prosecute drug cases too, but it's

9   different.  It is a different harm.  A person can traffic in a

10  controlled substance, including crack cocaine, which I believe

11  based on my years of practice in that area has been a scourge on

12  black communities across this country, but I respect what

13  Congress has done, but you can move on from that.

14      The fact of the matter is with regard to child sexual

15  exploitation, and specifically, in this case the production of

16  images, they can never ever, ever be retrieved.  And while

17  Mr. Butler is correct that the young boys, the teenage boys that

18  were involved in this were compliant at Mr. Newman's request and

19  engaged sometimes in person-to-person contact, sexual activity

20  and knowing that it was being videoed, could they really fathom,

21  did they know, did they know that their images were going to be

22  shared with other people?

23      I will tell you as an officer of the court, with regard to

24  one victim the answer to that is a profound no.  You will hear

25  from his parents.  When he found out that Mr. Newman had shared

1    that video, those videos with other people, he let out a cry

2    that I have never heard before and hope to never hear again.

3    That is not something that is remotely, remotely comparable to

4    dealing in crack cocaine or any other controlled substance.

5         That is why that indelible mark and the fact that we cannot

6    get those images back is one of the reasons that Congress has

7    set these potential penalties so very high and why it is very,

8    very appropriate in this case.

9         There was a representation made about, you know, we just

10   don't know about recidivism.  Even Mr. Breeding recognized that

11   he doesn't have a crystal ball, and he recognized that even the

12   empirical tests are based on gauging recidivism and that we can

13   only measure that when people are caught.

14       Mr. Newman had 16 plus victims before he was ever caught the

15   first time.  I think that speaks volumes about how much validity

16   we can put into statistics about recidivism rates when it is

17   totally reliant upon a person being caught.  His crimes are very

18   severe, very serious and had far reaching effects.

19       The comparisons about what Mr. Newman would face if he was

20   in state court as opposed to federal court, with all due

21   respect, really is like comparing apples and oranges.  They're

22   both fruit.  These are both court systems, but they have very

23   different sets of laws.

24       Mr. Newman is here because he didn't just sexually offend

25   against children in this commonwealth but because he also

sexually offended against children around this country, and as you heard from Special Agent Hutchinson and you can see from the exhibits that were filed with our sentencing memorandum and then under seal, with children that live outside this country as well.  His reach was far and wide and the path of destruction was significant.

The suggestion that Mr. Newman wasn't involved in any kind of grooming I think is defied by the evidence in this case.  If you look at the information that was provided to you, Your Honor, with regard to Count 10, these are communications that continue.  They started earlier but continued until May 13th of 2015, just three weeks before his arrest.  Mr. Newman was trading sexually explicit photos with this boy.  Later in the conversation Mr. Newman asked John Doe 9 to make a strip video for him.  He replied that he didn't know what to do, the boy did.

So Mr. Newman referenced some videos that he had sent John Doe 9 before, asked if he wanted him, Newman, to send another one and suggested to John Doe, "just copy it.  Here, let me show you what I want and you just copy it."  That, Your Honor, is grooming.  That is normalizing this behavior by showing him that another child has engaged in it and I want you to do it too.

John Doe 9 agreed and Mr. Newman sent him a video to emulate.  During that same communication, he told John Doe 9, and I quote, "So I've decided just to be flirty with one of my

1    students."

2        When John Doe 9 asked what he had said, he responded, "Oh,

3    nothing sexual for sure, just being really friendly and joking,

4    I guess, like I gave him a bunch of grief about his voice

5    cracking some today."  John Doe 9 didn't respond.

6        A few days later the communications continued and Newman

7    asked him for more sexually explicit images.  During a later

8    conversation, Mr. Newman asked him about his experiences with

9    others.  He asked if John Doe 9 had ever experimented with his

10   stepbrother, the same age as John Doe 9.  When John Doe 9 said

11   no, Mr. Newman gave him advice on how to initiate contact with

12   the boy, suggesting that he should, quote, "let him catch you

13   jerking off or something."

14       He also asked John Doe 9 to let him see what the stepbrother

15   looked like, and when he told him that he didn't have any

16   pictures right then, the two exchanged sexually explicit photos.

17   Your honor, that one exchange, these exchanges with one victim

18   defy any assertion that Mr. Newman did not engage in grooming.

19   He absolutely did.

20       The suggestion that because these children weren't babies,

21   that that should somehow encourage you to go closer to the low

22   end of the statutory mandatory minimum rather than the high end

23   is -- it's a little bit of a conundrum for me.

24       I certainly don't want to be understood as advocating that

25   sexual activity or the production of child pornography with

infants is okay because it isn't.  It's horrible and we all love

cute, little, pink rosy-cheeked babies.  We love them a lot and

we want to protect them a lot, but those images that are created

of those babies, as horrific as they are, don't show what they

look like going into young adulthood.  And if there is any grace

that is granted to victims of child sexual exploitation by God,

it would be that children who are victimized at really young

ages hopefully won't remember it.

     At the other end of that, Your Honor, are these teenage

victims.  They know what happened.  They will be faced with the

very bad decisions that they made for the rest of their lives,

and they will wonder always who has those images, who is looking

at that video that was made when I was 15 years old and dumber

than a box of rocks and doing it, but I have to live with it for

the rest of my life.  It is a horrible, horrible burden for them

to bear.  That is why you should not consider a lower sentence

based on the fact that these victims were 12 to 17 years old and

not infants or toddlers.

     With regard to Mr. Fogle's case in the Southern District of

Indiana, it's something that we hear about a lot.  It made a lot

of news and I am not condoning Mr. Fogle's conduct in the least.

However, I have looked at the charging document in that case.  I

am professional friends with the prosecutor in that case, Steve

DeBrota.  Mr. DeBrota could hardly be considered a lightweight

when it comes to prosecuting child exploitation cases.

1    I've also talked to the lead investigator in that case.  We

2    had the great fortune of having the benefit of his hard work and

3    insight in a case here locally about a year or so ago, Detective

4    Darin Odier.  They charged that case based on the evidence that

5    they had, and as defense counsel noted, there were no production

6    charges with regard to Mr. Fogle.

7        Did Mr. Fogle travel across state lines and have sex with

8    17-year-olds, who were already engaged in prostitution, which is

9    a horrible life for them, I know?  Yes, he did and that was

10   taken into account.  Was he asking other people to send him

11   surreptitiously prepared or made videos of children undressing

12   in lewd and lascivious ways?  Yes, he did and he was punished

13   for that.  That is a far cry, although very, very bad -- and I

14   have to respect the judgment of my colleague, Mr. DeBrota, in

15   the way that he charged it and resolved it.  It is a far cry

16   from what happened in this case.  And while it's out there and

17   we all know about it, I do not think that it should stand for

18   any proposition that Mr. Newman should receive a reduced

19   sentence.

20       Your Honor, Mr. Newman exchanged pictures and videos with at

21   least 56 other people.  We know that from the investigation in

22   this case.  He had 87 additional videos separate and apart from

23   anything that he acquired from these children for his viewing

24   pleasure in his DropBox account.  It is a massive collection.

25       The children that are depicted in those images are

1  important.  They're important to the people in their lives, and

2  I would submit to you that they are just as important as the

3  children who weren't sexually offended who go to private schools

4  in this area.  That's probably not a very artful argument.  My

5  point is the fact that Mr. Newman hadn't engaged in sexual

6  activity that we know of with any of his students, that's good.

7  I'm glad that those families did not have to go through that,

8  that they don't have to suffer that kind of harm, but they're no

9  more important and deserve no more protection from the law than

10  all of these children who did not go to Catholic elementary or

11  high schools in the city of Louisville and who were induced and

12  enticed and brought along by a man who had a tremendous insight

13  on how to get them to produce images for his own sexual

14  satisfaction.

15      For all of those reasons and what we have already argued to

16  the court in our sentencing memorandum, we strongly urge you to

17  consider imposing that 120-year sentence.  Thank you.

18          MR. BUTLER:  Your Honor, may I just respond to a

19  couple of points and I'll be very brief.

20          THE COURT:  Yes, I'll give you a couple of minutes,

21  Mr. Butler.  The hour is getting late and we still have a ways

22  to go but, yeah, go ahead.

23          MR. BUTLER:  Very briefly, sir.  Number one, in all

24  due respect to Ms. Lawless, I did not equate crack cocaine

25  offenses with the offenses before the court.  My point is this

1    and I stand by it, that it has not been that many years ago that

2    these child pornography guidelines were drastically different

3    than they are today and the punishment was drastically less.

4    And it's not been that many years ago that the crack cocaine

5    guidelines were drastically higher than they are today.

6         These things are ever changing and I think when we look at

7    this -- she referenced the state statutes and we look at how the

8    double counting goes in these guidelines, those are strong

9    reasons for a variance.

10        Second and with regard to Ms. Lawless's point about

11   grooming, there are no victims for Our Lady of Lourdes.  There

12   are no victims from Trinity.  And I agree with her, everyone

13   deserves protection under the law, whether they go to Lourdes or

14   Trinity or whether they're from Istanbul.  We all deserve

15   protection under the law, but the point is -- the point's not

16   that he's not going to punished and that he's not going to be

17   punished severely.

18        The point is, number one, none of these people -- and I'm

19   not blaming victims, but none of these people were on the

20   internet seeking this out.  That's why there aren't anyone from

21   Lourdes or Trinity.  That doesn't excuse what he did, but it is

22   a factor to be considered.

23        It also, I think, is important when we factor in what is his

24   likely future conduct that he was surrounded by people that were

25   in the age group that he was attracted to and there were no

1    victims at those schools and he will never, no matter what you

2    do, ever be surrounded by people in that age group again because

3    he's never going to get that type of job whenever he's released.

4    Thank you, sir.

5              THE COURT:  All right.  Ms. Lawless, you mentioned

6    earlier victim or victims' family may wish to make a statement.

7              MS. LAWLESS:  Yes, Your Honor.  Judge, as they're

8    coming forward, I know you're familiar with the Crime Victim's

9    Rights Act, and one of the things that is afforded to crime

10   victims under that federal statute -- there are several

11   important things.  One is that their identity be protected and

12   so I have asked the parents to talk to you.  It's a little

13   stilted because they're not going to use their son's name.  We

14   do not want any more harm to come to him.  And I have asked them

15   to only introduce themselves to you by their first names and

16   that's the reason we're doing that, under the Crime Victim's

17   Rights Act, to protect his identity and his privacy.  And, of

18   course, they are here because they are his parents and

19   exercising the rights of a victim to address the court as regard

20   to sentencing matters.

21             THE COURT:  All right.

22             JEREMY:  Your Honor, my name is Jeremy and I'm John

23   Doe Number 4's father.  My family's been changed forever.  We've

24   been attacked by a manipulative, aggressive, and evil monster

25   that uses his position, size, and charisma to prey on the

vulnerable for his own gratification.

Life will never be the same for us.  I used to have a child who was outgoing, confident, and happy and now I have a shell of a child who is angry, withdrawn, and self-destructive.

Mr. Newman is the face of evil.  When I first found out about what he had done to my child and saw the pain, disgust, and shame on his face, I hurt more than you could possibly imagine.  I was emotionally numb for several days and, as the numbness wore off, the anger started to rise.

Mr. Newman, you are real lucky that I couldn't get ahold of you at that time.

I pray to God every day for the safety of my children because of people like him.  I pray that my son will overcome the damage that he has done, but I know with the help of God that he will be fine.

Mr. Newman may have victimized my family, but we will not remain victims.  My child and my wife will be in therapy for a long time because of what he has done.  My son is still a child and is not capable of making grown-up decisions.  Regardless of the amount of participation that my child may have -- for my child, Mr. Newman must take sole responsibility for his actions.

I believe that the only reason that Mr. Newman assisted Agent Hutchinson and Ms. Lawless with their investigation and pled guilty was to hopefully stop them from looking for more victims.  I hope there aren't any more victims for their sake.

1          Due to the recording and sharing of the disgusting video you

2     made of you and my son, the hurt will continue for a lifetime.

3     I pray that you receive the maximum penalty under the law for

4     what you've done to my son and my family and your other victims

5     and their families.

6          There is no cure for a person like you.  You are a

7     disgusting pedophile and there is no cure but to be permanently

8     removed from the earth.  I hope that you have to sleep with your

9     eyes open and watch your back your entire time in prison for

10    fear of what might happen.

11         Our family has become isolated from our extended family and

12    friends because of the shame and the guilt that has happened.

13    There are few resources for victims and we can't turn to family

14    because of the embarrassment that we feel.

15         Mr. Newman's actions have also turned our son, who would

16    normally be able to tell us anything, into someone who has

17    become secretive and reclusive.  Mr. Newman has also made me and

18    my wife feel like we failed as parents because we failed to

19    protect our child from the monster that he is.  Thank you.

20              THE COURT:  Thank you, sir.

21         Anything further, Ms. Lawless?

22              MS. LAWLESS:  Yes, Your Honor.

23              DONNA:  My name is Donna.  Our lives have forever been

24    changed by the unchangeable events that took place by this man

25    taking advantage of an insecure teenage boy, my child, my baby.

My son may have been compliant but this man used the insecurities of my son to prey on him.  He stole the innocence from my child and it cannot be replaced.

The family I had before that day finding out what had happened is no longer.  The son I had before that day is no longer.  He ripped apart -- Mr. Newman ripped apart every bit of security I had.  Every awkward moment because of the shame and guilt my son feels causes the hatred and anger to grow.

When my son found out the videos of him and Mr. Newman had been shared, he let out a scream of pure anguish like that of a fatally wounded animal waiting to die because he wanted to die.

I hate you for what you have done.  I hate you for every awkward moment that comes between me and my son because of the shame that he will carry with him.

No words could ever come close to describing the pain or heartbreak that I feel.  I have to deal with feelings of failure as a protector of my child daily.  I cannot fix my son.  I cannot restore him, but my faith in the restoration of the power of God is the only hope I have to hold on to.  And I know your mom, her hurt breaks too and I have compassion for your mom.  I'm sorry.  But you took from me, you took, you stole, you stole from me and I can't get it back, but I'm sorry for your family and friends.  But I want you to pay because we will pay forever and I think that you should too.

          MS. LAWLESS:  Thank you.

1          THE COURT:  Any further victim?

2          MS. LAWLESS:  One more, Your Honor.

3          THE COURT:  Yes.

4          MS. LAWLESS:  As Special Agent Hutchinson testified,

5    Your Honor, leads have gone out and a victim was notified, a

6    victim and his family were notified in New York.  And last night

7    I received a victim impact statement from those parents, and

8    they asked for me to read it to you in open court:

9          This is a very difficult piece to write because fortunately

10   or unfortunately we have little concrete evidence as to how

11   Mr. Newman's despicable actions, his criminal contact and

12   behavior online towards our son has impacted him to date or will

13   impact him in the future.

14         We have only just learned that our son was a victim of a

15   child predator and pornographer in the last six weeks, and by

16   most standards our son is doing well, thank God.  But to be

17   clear, there are impacts on him, on his parents, on his brothers

18   and on our family unit.

19         Impact:  A horrible fright.  The shock of being visited upon

20   by Homeland Security before 7:00 a.m. on a school day just days

21   after the terrorist attack in Paris was intense.

22         Why were these agents on our doorstep and what horrible news

23   were they going to tell us?  My first fear was that something

24   happened to our son, who is away at college.  Thankfully, they

25   reassured me that our son in college was fine, but of course,

the fact that they knew his name, his college and more was
unsettling.  Then they broke this news to us.  They believed one
of our sons was the victim of a crime.

Impact:  Added anxiety.  Our 13-year-old son, who suffers
from anxiety, heard the whole exchange and admits that not only
has he become more paranoid about predators like Mr. Newman
online, he is concerned about how much information the agents
had about him and our whole family.  Don't get me wrong, we are
thankful for the professional job done by our Homeland Security
agents, but our son's innocence was lost that day when they
realized how much of their lives was monitored by strangers.

Impact:  Infringement of rights.  I am a teacher of ninth
and tenth graders, and my husband and I have three teenage boys.
We are well aware of the dangers of the internet, especially of
the criminals trolling it and seeking to mentally, emotionally,
sexually and even physically abuse innocent young people.

We know it is all of our responsibility to teach our loved
ones and our students how to protect themselves online, but we
are also well aware that the internet provides a wealth of
information to our young people.  So much of what they learn
about the world is accessed via the internet.  Let's face it, so
much of what we adults learn today is learned online.

Our children should have the right to explore the online
world in the safety of their homes and the safety of their
bedrooms without being preyed upon by sexual criminals.

1    Impact:  Broken trust.  What really upsets us about

2    Mr. Newman is that he parlayed his position as a teacher in his

3    sexual bullying.  By referring to himself online as a, quote,

4    teacher, end quote, to our son, he has betrayed a respectable

5    and important profession.  He has used whatever God-given gift

6    he has that allowed him into the classroom to begin with to harm

7    the very people he was given license to teach and protect.

8    Impact:  Repressed fears and emotions.  We don't know how

9    Mr. Newman's behavior towards our son is affecting him.  Our son

10   won't speak about it.  He is very closed up on the topic and

11   just wants it to go away.  He heads off to college next year and

12   we can only hope and pray that he is emotionally healthy when he

13   goes.

14   We all know that the repression of scary and overwhelming

15   events eats away at you, that it impacts your future

16   relationships and possibly your own future sexual encounters.

17   We don't know when our son will want to talk about what

18   happened or to whom, and we don't know whether he will ever be

19   able to figure out what part of his identity was impacted by

20   Mr. Newman and what part wasn't.

21   Impact:  Fear and worry and horrific images that won't go

22   away.  We realize the impact on our son may sound vague to you,

23   because right now it is unclear what the impact is even to us,

24   but as adults we know these things come back to haunt.  We know

25   that the other shoe will in fact one day drop.  So as parents,

the impact on us is clear.  From the minute we learned our son
was a victim of a child predator and pornographer, we have slept
less and worried more.  We have read horrific accounts of
Mr. Newman's behavior online.  We have started looking for an
appropriate therapist to work with our son before he goes off to
college next year, and we have even argued between ourselves
about how to address the topic in our own family.

   Impact:  Our first family secret.  Our 13-year-old son, the
youngest, was home when Homeland Security showed up on our
doorstep so he basically knows what happened.  We felt we had to
give him the backstory when he learned it because he was part of
the investigation.

   Our oldest son was away at college, and our middle son, the
one victimized by Mr. Newman, asked that we not tell his older
brother what had happened.  So we now have a, quote, secret,
unquote, in our family.  One of our family values has been to
not have, quote, secrets, end quote, because in essence while we
view privacy, in quotes, as important and beneficial, secrets,
in quote, almost always point to something toxic and divisive.
We have spent our 20 plus years as a family with essentially no
secrets.  Mr. Newman, a person we've never met and never want to
meet, has changed that.

   Impact:  Needless shame.  Our victimized son worries that
his brothers are going to question his sexual preference.  He
has been robbed of the positive, albeit sometimes puzzling,

experience of coming to grips with his sexuality in his own way
in his own time.  Whatever he learns about himself and whenever
he knows it, his 15-year-old sexual curiosity will forever be
tainted by memories of criminal predatory behavior.

A horrible fright, added anxiety, an infringement upon
rights, a broken trust, repressed fears and emotions, fear and
worry and horrific images that won't go away, a family secret in
a family that doesn't keep secrets, and needless corrosive
shame, this is the impact that Mr. Newman's actions have had
upon us.

Thank you for granting us the opportunity to be heard.  Our
thoughts and prayers go out to the families of all the other
victims.

And it is signed by his parents.  That's all we have, Your
Honor.

THE COURT:  All right.  Thank you.  Mr. Butler, does
Mr. Newman wish to invoke his rights and address the court?

MR. BUTLER:  He would like to address the court, yes,
sir.

THE COURT:  All right.  Please come around to the
podium, Mr. Newman.

THE DEFENDANT:  Your Honor, thank you for giving me
the chance to make a statement on my own behalf.  As my attorney
said, I'm very well educated, but I don't have the words to say
I'm sorry in the right way.  I don't think they exist so I'm not

1    going to try to come up with them off the top of my head, but
2    I -- as you know, I was a teacher at two very, very well
3    regarded schools and a football coach for one of the best
4    football programs -- high school programs in the country.  And
5    so in my life I've never been someone who's accepted excuses
6    from anyone else, and I'm not trying to in any way excuse
7    anything I did.
8        But when I was going through the meetings with Mr. Breeding,
9    it came to me that maybe there's an explanation.  And it might
10   not be anything that makes sense but it's -- I guess has made
11   sense to me so it's helped me to try to start to heal and find
12   out ways that I can better myself going forward.
13       For the last 15 to 20 years, I've been someone who has
14   struggled with my own sexual orientation and what I am
15   physically and sexually attracted to.  It started when I was,
16   you know, becoming -- you know, going through puberty, 14, 15,
17   16 years old that I realized that I had both an attraction to
18   females who were peers or, you know, older and -- but I also had
19   an attraction to males who were my peers, the kind of late
20   teens/early 20 years.
21       And as I grew up and as I matured, the attraction to females
22   matured as well, but I realize that the attraction to -- that
23   14, 15 to 24, 25 remained and it was something that I struggled
24   with and for years I never knew where to turn.  It's not
25   something that you can just go and talk to someone about or it's

1    something I never felt like I could talk to someone about.

2         And then a couple of years ago when I found the applications

3    on my smartphone, the KIK, the Snapchat, Vine and then Grindr,

4    that I was able to find other people that had some of those same

5    feelings that I had had when I was their age and it was -- I

6    found someone I could talk to about things that I couldn't talk

7    to anyone else about.  And in my heart I always knew that it was

8    wrong, but I was finding answers to questions that I had had

9    about myself that I couldn't talk to anyone else -- I don't

10   think that they could talk to anyone else too, and that included

11   people that were of age, over the age of 18.

12        And so that progressed to chats that were sexually graphic

13   and videos and pictures that I absolutely regret ever consider

14   making.  And then on the Grindr app, I was able to meet people

15   who were both under and over the age of 18 for physical

16   encounters, something that I hadn't ever done before, even with

17   women.  It was something where I could -- I guess had a low

18   self-image of who could find me physically attractive.

19        And so I don't think there was -- and, again, it was nothing

20   I -- I knew it was wrong.  I knew it was against -- I'm a

21   practicing Catholic.  I have been all my life and even -- I

22   didn't even feel that I could trust the sanctity of a confession

23   booth to go and tell a priest that would never say anything to

24   anyone because I had nowhere to turn.

25        And so I think -- I want you to consider is -- for going

1    forward is that I think I'm someone worth a second chance.  I

2    don't -- I don't think that I would have ever offended in the

3    first place if I hadn't had -- if I, one, had someone to turn

4    to, someone that I could talk to this about, someone that I

5    could help and seek treatment.  And that's -- not only do I --

6    you know, not only am -- do I have to do it, I want to do it.

7    I've been trying to do it my whole life.  I just never knew who

8    to ask or sometimes even what questions to question.

9        And I have people now -- who knows how many people in the

10   courtroom here that are standing not just behind me but standing

11   beside me to help me through that.  And I wish -- in hindsight,

12   I wish I could have gone back and confided in them before

13   because this would have never happened.

14       And then the second thing, I am 100 percent sure that I

15   wouldn't have found any way to violate anything if I hadn't

16   found those apps on my smartphone.  And I know from talking with

17   others and with talking with my attorney that there's no

18   possible way -- and I don't want to -- that there's no possible

19   way I could have access to any of that ever again and I don't

20   want it.

21       I want to try to become what I was before that day that I

22   was arrested to most of the people that knew me that knows a

23   decent member of society.  And I was someone that people could

24   point to and say, "I'm proud to know him.  He made a difference

25   in my life."  I don't know how I can going forward, but I'll

1    find a way.

2        And I think if you give me a second chance to spend whatever

3    time I have left with my family, whatever family is still there,

4    I will spend as much time with them as possible, try to help

5    them as much as I can, try to help anyone else and pay back the

6    support I've gotten.  And I think I can be someone that you --

7    not only will you not regret giving me a second chance, but you

8    can be proud that you gave me a second chance.  You can point to

9    me and say, "There's a success.  There's someone people can look

10   to and emulate and say, 'That's the way it's done,'" because

11   I've done that in my professional and my athletic -- athletics

12   all my life and I want to be that person.  Thank you.

13           THE COURT:  All right.  Thank you, Mr. Newman.

14       Mr. Butler, anything further at this point?

15           MR. BUTLER:  No, Your Honor.  Thank you, sir.

16           THE COURT:  Ms. Lawless, anything further at this

17   point?

18           MS. LAWLESS:  No, sir.

19           THE COURT:  All right.  I realize, again, that the

20   hour is late.  We've been at this for a while.  It's now 5:15,

21   but I find it necessary at this point for us to take a brief

22   15-minute recess.  That's going to allow our court staff to make

23   arrangements for staying past the 5:00 hour.  It will also give

24   me an opportunity to collect my thoughts before I discuss the

25   process that gets me to the sentence that I will ultimately give

1    out today.  So we'll stand in recess until about 5:32.

2         (Recess at 5:15 p.m. until 5:47 p.m.)

3              THE COURT:  Thank you.  Please be seated.

4              DEPUTY CLERK:  Back on the record in 3:15-CR-83,

5    *United States of America v. Newman.*

6              THE COURT:  All right.  Let me first ask a

7    housekeeping question.  Ms. Lawless, am I correct that

8    restitution is not an issue here?

9              MS. LAWLESS:  Legally it is, Your Honor.  This, of

10   course, is covered by the mandatory restitution act.  However,

11   practically for purposes of this case, we have not received any

12   requests for restitution.  The services that we have recommended

13   for victims and the services that have been provided up to this

14   point have been made available through child advocacy centers in

15   different parts of the country at either no cost to the families

16   or within what their insurance carriers could cover so we do not

17   have any request at this time.

18             THE COURT:  All right.  So you don't anticipate asking

19   me to order restitution?

20             MS. LAWLESS:  I do not, Your Honor.

21             THE COURT:  All right.  Thank you.

22        Let me begin by saying what should be obvious to everyone

23   who has observed this sentencing hearing this afternoon.  This

24   is a tragic and difficult case to say the least.

25        I have carefully considered all of the submitted materials,

1   the presentence investigation report, the testimony and the

2   arguments that we've heard today, all of the submitted materials

3   that counsel on both sides have provided the court.

4       As you know, I've also heard from some of the victim

5   families, and I've heard directly from Mr. Newman.  I will note

6   that the process has been aided by outstanding advocacy on both

7   sides.

8       After assessing the particular facts of this case, in light

9   of the relevant Section 3553 factors, including the sentencing

10  guidelines, I conclude that a sentence outside the guideline

11  range of life is warranted, and I will sentence the defendant to

12  a total sentence of 504 months, representing a variance from the

13  applicable guideline range of life.

14      I cannot agree to the defense request for a variance that

15  reaches down to the statutory minimum of 15 years.  I believe

16  that such a sentence would significantly understate the serious

17  nature of these crimes.

18      It is true that Mr. Newman has now accepted responsibility

19  for his crimes and he will avoid a life sentence in part because

20  he has accepted responsibility, but the nature and scope of

21  these crimes is truly extraordinary.  He was prolific and

22  relentless in his pursuit of these young victims.  There was no

23  hint of hesitation or regret in his communications with them or

24  about them.  A total of 16 young people as charged here, aged 12

25  to 17, were manipulated and exploited by Mr. Newman.  This was

1    in essence selfish, arrogant, and obviously, harmful abuse.

2        The fact that no violence was threatened may militate

3    against a life sentence, but that fact alone would not justify a

4    variance down to 15 years.

5        The United States has recommended what is essentially a life

6    sentence, and although it is a close call given the breadth of

7    the crimes committed here, I will not go along with that

8    recommendation only because I believe that a reasonable variance

9    from the sentencing guidelines is warranted here given the

10   defendant's cooperation and acceptance of responsibility and

11   willingness to avoid a trial, thus protecting the victims from

12   having to endure further involvement in these proceedings.  And

13   I also believe it's important to fashion a sentence consistent

14   as is possible with other cases with similar charges.

15       Accordingly, I will now impose the sentence.  The court

16   having considered the advisory sentence guidelines and 18 U.S.C.

17   Section 3553(a), I now impose the following sentence:  It is the

18   judgment of the court that the defendant is committed to the

19   custody of the Bureau of Prisons for a term of 504 months as to

20   Count 2 of the indictment, 360 months as to each of Counts 1 and

21   3 through 17, 240 months as to Count 18, 120 months as to Count

22   19 in the information, which shall be served concurrently, for a

23   total term of 504 months' imprisonment.

24       Upon release from imprisonment, the defendant shall be

25   placed on supervised release for a term of life as to each of

```
 1   Counts 1 through 19, which shall run concurrently, for a total
 2   term of life.
 3       The defendant shall abide by the standard conditions of
 4   supervision adopted by the court, as well as the special
 5   conditions of which a copy has been provided to the defendant
 6   and counsel for the United States as well.  These special
 7   conditions include specific sex offender conditions, which will
 8   be explained by the U.S. Probation Officer.
 9       Mr. Butler, can you confirm that you-all have received a
10   copy of those --
11           MR. BUTLER:  Yes, sir, I have.
12           THE COURT:  -- special conditions?
13       Do you have any objection or comment on those conditions at
14   this time?
15           MR. BUTLER:  No, Your Honor.
16           THE COURT:  All right.  In addition, the defendant
17   shall pay a special penalty assessment fee of $100 as to each
18   count of conviction for a total special penalty assessment of
19   $1,900.
20       Any financial sanctions imposed shall be paid in accordance
21   with the schedule of payments page, which will be contained in
22   the judgment.
23       Restitution is not an issue in this case, as we just
24   discussed.  The fine and costs of investigation, prosecution,
25   incarceration, and supervision are waived due to the defendant's
```

1    apparent inability to pay.

2        The court considers the defendant to be a low risk of

3    substance abuse and mandatory drug testing will be suspended

4    until further order of the court.

5        Having considered 18 U.S.C. 3553(a) and the advisory

6    guidelines, which produce a total offense level of 43 and a

7    Criminal History Category of I, the advisory guideline here is a

8    life term of imprisonment, a fine of 25,000 to $250,000, and

9    five years up to life supervised release.

10       I find that a sentence of 504 months' custody, followed by a

11   life term of supervised release, is sufficient but not greater

12   than necessary to comply with the purposes set forth in 18

13   U.S.C. Section 3553(a).

14       Begin with you, Mr. Butler.  Are there any objections to the

15   sentence that I've just announced or special conditions, which

16   will be included in the judgment, which have not already been

17   raised?

18           MR. BUTLER:  Not that haven't already been stated,

19   Your Honor.

20           THE COURT:  All right.  And from the United States?

21           MS. LAWLESS:  Your Honor, we would object to the

22   sentence.  We recognize the need for a variance but for the

23   reasons that we argued before would have urged the court for 120

24   years but respect the court's ruling.

25           THE COURT:  All right.  I now need to advise you,

1    Mr. Newman, of your rights to appeal.  You can appeal your

2    conviction if you believe that your guilty plea was somehow

3    unlawful or involuntary or if there's some other fundamental

4    defect in the proceedings that was not waived by your guilty

5    plea.

6        You also have a statutory right to appeal your sentence

7    under some circumstances, particularly if you think the sentence

8    is contrary to law.

9        We have a form where you -- we will ask you to sign and

10   acknowledge that the court has advised you of your right to

11   appeal.  It also indicates that if you do not have sufficient

12   money to pay for the appeal, you have a right to apply for leave

13   to appeal without having to pay for it.  This appeal must be

14   filed within 14 days from entry of the judgment that will follow

15   today's hearing.

16       If you are without the services of an attorney and want to

17   appeal, the clerk of court will prepare and file a notice of

18   appeal on your behalf, if you so request.

19       And I'll ask the CSO to provide Mr. Butler with that form,

20   please.

21       Ms. Lawless, do we have anything else that we need to

22   discuss?

23               MS. LAWLESS:  Not on behalf of the United States, sir.

24               THE COURT:  Mr. Butler, anything further?

25               MR. BUTLER:  No.  Thank you, Your Honor.

1          THE COURT:  We're adjourned.  Thank you.

2      (Proceedings concluded at 5:56 p.m.)

3

4                   C E R T I F I C A T E

5      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

6   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8   _____          January 25, 2016
        s/Dena Legg
9   Certified Court Reporter No. 20042A157      Date
    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2    GOVERNMENT WITNESSES:

 3    DETECTIVE JOSEPH ADCOCK
           Direct Examination by Ms. Lawless        6
 4         Cross-Examination by Mr. Butler          10
      SPECIAL AGENT BRAD HUTCHINSON
 5         Direct Examination by Ms. Lawless        11
           Cross-Examination by Mr. Butler          22
 6         Redirect Examination by Ms. Lawless      28
           Recross-Examination by Mr. Butler        32
 7    DR. BRIAN REYNOLDS
           Direct Examination by Ms. Lawless        33
 8         Cross-Examination by Mr. Butler          36

 9    DEFENSE WITNESS
      DAVID BREEDING
10         Direct Examination by Mr. Butler         37
           Cross-Examination by Ms. Lawless         46
11         Redirect Examination by Mr. Butler       65
           Recross-Examination by Ms. Lawless       68

12

13                            EXHIBITS

14
      GOVERNMENT:
15    Exhibit 1 (filed under seal)                  8
      Exhibits 2 through 16 (filed under seal)      15
16    Exhibit 17 - letter                           3

17
      DEFENDANT:
18    Exhibit 1 - abstract re:  MnSOST-3            68
      Exhibit 2 - abstract re:  Static 2002-R       68
19    Exhibit 3 - abstract re:  Static-99           68

20

21

22

23

24

25
```